674 F.2d 134
 6 Collier Bankr.Cas.2d 321, Bankr. L. Rep. P 69,005
In re UNITED MERCHANTS AND MANUFACTURERS, INC., et al., Debtors.
UNITED MERCHANTS AND MANUFACTURERS, INC., et al., Debtors-Appellees,
v.
The EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES
and John Hancock Mutual Life Insurance Company,
Defendants-Appellants.
 No. 84, Docket 81-5017.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 4, 1981.
Decided Feb. 24, 1982.
 
 Joel B. Sweibel, P. Gregory Schwed, New York City (Kramer, Levin, Nessen, Kamin & Soll, New York City, of counsel), for defendants-appellants.
 Michael J. Crames, New York City (Myron Trepper, Joel Holstein, Levin & Weintraub, New York City, of counsel), for debtors-appellees.
 Before WATERMAN, OAKES and MESKILL, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 The Equitable Life Assurance Society of the United States ("Equitable") and John Hancock Mutual Life Insurance Company ("Hancock") appeal from an order of the United States District Court for the Southern District of New York, Knapp, J., disallowing their claims in a bankruptcy proceeding pursuant to Chapter XI of the former Bankruptcy Act[1] for collection costs and liquidated damages. Appellants contend that agreements under which they extended loans to United Merchants and Manufacturers, Inc. ("UM&M"), provided for recovery of the claimed amounts upon UM&M's filing of its bankruptcy petition, a default under the terms of the loan agreement. Judge Knapp affirmed so much of an order of the Bankruptcy Court for the Southern District of New York, Babitt, J., as had disallowed appellants' claims for liquidated damages, but reversed the bankruptcy court's decision to allow limited recovery of collection costs. We reverse and remand for further proceedings.
 
 BACKGROUND
 
 2
 Equitable and Hancock extended unsecured loans totaling $45,000,000 to UM&M in 1973 and 1975, respectively. On July 12, 1977, UM&M and several of its subsidiaries filed petitions for arrangement under Chapter XI of the former Bankruptcy Act. Under the direction of the bankruptcy court, a creditor's committee was formed and a plan of arrangement was negotiated. The bankruptcy court confirmed the plan on June 30, 1978.
 
 
 3
 During the course of the bankruptcy proceedings, Equitable and Hancock filed proofs of claim aggregating $28,071,892.23 and $22,602,802.08, respectively. These claims included the outstanding principal balances of the loans to UM&M, interest accrued on these balances to the filing of UM&M's Chapter XI petition, certain pre-petition expenses, collection costs including attorney's fees, and liquidated damages. The claims for collection costs and liquidated damages arose from two provisions of the loan agreements[2] addressed to the contingency of default. Equitable and Hancock maintain that these provisions were activated by the filing of the Chapter XI petition.
 
 
 4
 UM&M filed objections to the claims for collection costs and liquidated damages. The bankruptcy court found the liquidated damages clause of the loan agreements invalid under New York law[3] and contrary to the policies underlying the Bankruptcy Act. Judge Babitt allowed the claims for collection costs, including reasonable attorney's fees, but only to the extent that such costs were incurred for services rendered outside the Chapter XI proceeding.
 
 
 5
 The district court affirmed Judge Babitt's rejection of the liquidated damages claim, but reversed his allowance of the claim for collection costs, holding that an unsecured creditor may not recover costs incurred in a Chapter XI proceeding to protect its rights against the debtor. Thus, the district court disallowed in full the claims for collection costs and liquidated damages. Equitable and Hancock appeal from this ruling.
 
 DISCUSSION
 I. Collection Costs
 
 6
 Section 11.2 of the loan agreements provides in pertinent part:
 
 
 7
 (UM&M) covenants that, if it shall default in the making of any payment due under any Note, it will pay to the holder thereof such further amounts, to the extent lawful, as shall be sufficient to pay the costs and expenses of collection, including reasonable counsel fees.
 
 
 8
 Appellants contend that upon UM&M's filing of its Chapter XI petition, a default under the terms of the loan agreements, section 11.2 gave rise to a contractual obligation provable in bankruptcy under section 63(a) of the Bankruptcy Act.[4] Accordingly, Equitable and Hancock filed proofs of claim in the amounts of $66,374.21 and $68,762.68, respectively, for expenses incurred in protecting their interests in UM&M's assets.
 
 
 9
 The validity of a clause in a loan agreement providing for recovery of collection costs upon default is determined by state law. Security Mortgage Co. v. Powers, 278 U.S. 149, 153-54, 49 S.Ct. 84, 85-86, 73 L.Ed. 236 (1928); 3A Collier on Bankruptcy P 63.15(1), (3) (14th ed. 1975). UM&M does not dispute that the collection costs provisions in this case are valid under New York law. See, e.g., Waxman v. Williamson, 256 N.Y. 117, 122-23, 175 N.E. 534, 536 (1931); Mead v. First Trust & Deposit Co., 60 A.D.2d 71, 76, 400 N.Y.S.2d 936, 938 (4th Dep't 1977). Nevertheless, UM&M urges us to disallow appellants' claims on the basis of policy considerations underlying the Bankruptcy Act.
 
 
 10
 In ruling that an unsecured creditor's contractually-based claim for collection costs is not cognizable in bankruptcy, Judge Knapp recognized that a primary "purpose of the Bankruptcy Act is to bring about an equitable distribution of the bankrupt's estate among creditors holding just demands ...." Kothe v. R. C. Taylor Trust, 280 U.S. 224, 227, 50 S.Ct. 142, 143, 74 L.Ed. 382 (1930). He reasoned that this principle "should bar enforcement of any contractual provision which would permit one creditor-and not others-to charge the estate with legal expenses associated with processing a claim before a bankruptcy court." 10 B.R. 312, 314 (S.D.N.Y.1981). Judge Knapp distinguished cases permitting secured creditors to recover attorney's fees to the extent that their security covered such fees, e.g., James Talcott, Inc. v. Wharton (In re Continental Vending Machine Corp.), 543 F.2d 986 (2d Cir. 1976), on the ground that a secured creditor who asserts contractual rights in his security does not "impinge( ) upon the administration of an estate in bankruptcy" because "the security has, in effect, been conveyed to such creditor, and his title thereto is superior to that of any trustee in bankruptcy." 10 B.R. at 315.
 
 
 11
 We cannot agree that the policy of equitable distribution renders an unsecured creditor's otherwise valid contractual claim for collection costs unenforceable in bankruptcy. When equally sophisticated parties negotiate a loan agreement that provides for recovery of collection costs upon default, courts should presume, absent a clear showing to the contrary, that the creditor gave value, in the form of a contract term favorable to the debtor or otherwise, in exchange for the collection costs provision. Such a creditor should recover more in the division of the debtor's estate because it gave more to the debtor at the time it made the loan. Rather than providing an undeserved bonus for one creditor at the expense of others, allowing a claim under a collection costs provision merely effectuates the bargained-for terms of the loan contract.
 
 
 12
 Moreover, the case law does not support a distinction between secured and unsecured creditors who seek to recover collection costs in bankruptcy. In Security Mortgage Co. v. Powers, 278 U.S. 149, 49 S.Ct. 84, 73 L.Ed. 236 (1928), Justice Brandeis wrote for the Court: "The character of the obligation to pay attorney's fees presents no obstacle to enforcing it in bankruptcy, either as a provable claim or by way of a lien upon specific property." Id. at 154, 49 S.Ct. at 86 (emphasis added). If the Security Mortgage Court contemplated recovery of attorney's fees by secured creditors only, the reference to a "provable claim" would have been meaningless.
 
 
 13
 Cases from other circuits also support this view. In Worthen Bank & Trust, N.A. v. Morris, 602 F.2d 826 (8th Cir. 1979), the court allowed an undersecured creditor to prove a claim for attorney's fees incurred after the debtor filed a Chapter XIII petition, where the claim was partially unsecured because the creditor's security was insufficient to cover both the underlying obligation and the attorney's fees. In LeLaurin v. Frost National Bank, 391 F.2d 687 (5th Cir.), cert. denied, 393 U.S. 979, 89 S.Ct. 447, 21 L.Ed.2d 440 (1968), the court similarly allowed an unsecured creditor to add attorney's fees to its claim against the bankrupt's estate.[5]
 
 
 14
 UM&M also asserts two spurious arguments that merit only brief comment. First, UM&M cites section 506(b) of the Bankruptcy Reform Act ("Code"), which took effect after the filing of the petition in this case,[6] to support its contention that only collection costs incident to recovery of secured claims are cognizable in bankruptcy. Section 506(b) permits an oversecured creditor to recover, to the extent of its security, certain expenses for which the agreement giving rise to its underlying claim provides. UM&M asserts that the legislative history of section 506(b) indicates that the statute was intended to codify pre-Code law that only a secured creditor can assert a contractually-based right to recover collection costs. Brief for Appellees at 28-29. Section 506(b), however, merely codifies pre-Code law that an oversecured creditor can assert, as part of its secured claim, its right to interest and costs arising under its credit agreement. See S.Rep.No.95-989, 95th Cong., 2d Sess. 68 (1978), reprinted in (1978) U.S.Code Cong. & Ad.News 5787, 5854; H.R.Rep.No.95-595, 95th Cong., 1st Sess. 356-57 (1977), reprinted in (1978) U.S.Code Cong. & Ad.News 5963, 6312. Neither the statute nor its legislative history sheds any light on the status of an unsecured creditor's contractual claims for attorney's fees.
 
 
 15
 UM&M also asserts that "allowances for compensation and reimbursement of fees and expenses stemming from bankruptcy proceedings may not be granted by the Court unless they are specifically authorized by the Bankruptcy Act." Brief for Appellees at 38. Equitable and Hancock correctly respond, however, that their claims for collection costs are based in contract and are independent of statutorily compensable administrative expenses for services rendered to the estate. As such, these claims are provable under section 63 of the Act.
 
 
 16
 (I)t should always be remembered that a fee which may not be provided for as a matter of statutory right under the Bankruptcy Act may yet be perfectly permissible as a provable claim and a matter of contractual right.
 
 
 17
 3A Collier on Bankruptcy P 63.15(3) at 1854 (14th ed. 1975); see also James Talcott, Inc. v. Wharton (In re Continental Vending Machine Corp.), 543 F.2d 986 (2d Cir. 1976) (holding that recovery of certain costs claimed by a creditor in a Chapter X proceeding may be cognizable as a contractual right even though they are not within the Act's compensation provisions).
 
 
 18
 In short, we find no law or policy that supports the district court's disallowance of the claims by Equitable and Hancock for collection costs under section 11.2 of the loan agreements. To this extent, we agree with the position taken by the bankruptcy court.
 
 
 19
 We are compelled to disagree, however, with the bankruptcy court's ultimate ruling which limited appellants' recovery of collection costs to those incurred for services rendered outside the Chapter XI proceeding. Despite an earlier recognition that appellants' collection costs claims were based in contract, the bankruptcy court reasoned:
 
 
 20
 To the extent that claimants' schedules of services and time should point to services in the Chapter XI case in negotiating a plan or in participating in the Chapter XI proceedings as the scheme of the Act unfolded, these may not be compensated for there is no warrant in the Act to pay other than the Official Committee of Creditors under Rule 11-29, 415 U.S. 1022, 94 S.Ct. 3247, 39 L.Ed.2d XIV.
 
 
 21
 Bankr.Ct.Op. at 26-27. The bankruptcy court supported this reasoning by citation to Lane v. Haytian Corp. of America, 117 F.2d 216 (2d Cir.), cert. denied, 313 U.S. 580, 61 S.Ct. 1101, 85 L.Ed. 1537 (1941), and In re FAS International, Inc., 382 F.Supp. 77, aff'd, 511 F.2d 1164 (2d Cir. 1974), cert. denied, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975), which disallowed claims by parties other than the Official Committee of Creditors for recovery of the costs of administering estates in Chapter XI proceedings. As these cases hold, "(i)t is well settled that the bankruptcy court lacks power to grant, and the policy of the Act is against, compensation not expressly provided for by the Act." Lane, 117 F.2d at 219. See FAS International, 382 F.Supp. at 80-81. But both Lane and FAS International pertained to limitations on payment of compensation for expenses incurred in administering an estate. As stated above, the collection costs claims asserted here are part of the contractual indebtedness of UM&M to Equitable and Hancock, and therefore are not subject to the statutory limitations on reimbursement for expenses of administering the estate.
 
 
 22
 Finally, Judge Babitt appears to have relied on James Talcott, Inc. v. Wharton (In re Continental Vending Machine Corp.), 543 F.2d 986 (2d Cir. 1976), in holding that all costs incurred by appellants in the Chapter XI proceeding are unrecoverable because the services for which they were incurred duplicated those rendered by the Official Committee of Creditors. In re Continental involved a creditor's attempt to enforce a contract term providing for recovery from the debtor of certain expenses of protecting its interests in the debtor's property during a Chapter X proceeding. The Court recognized that "(t)he validity and construction of the (contract clause providing for recovery of costs) must ... be judged according to (state) law ...." Id. at 993. In In re Continental, as here, New York law applied. Moreover, the clause in question in that case provided for recovery of "all costs and expenses incurred, including a reasonable allowance for attorney's fees, ..." while the one here provides for "the costs and expenses of collection, including counsel fees." Thus, the problem of construction in In re Continental was virtually identical to that now before us.
 
 
 23
 In discussing the attempt of John Talcott, Inc., a secured creditor, to recover expenses covered by its contract, the In re Continental Court stated:
 
 
 24
 We interpret the agreement's broad language as permitting Talcott to recover for such services and expenses as were reasonably necessary to enforce the debtor's obligations and to collect the amount remaining due pursuant to those obligations. In applying this standard, a rule of reason must be observed, in order to avoid such clauses becoming a tool for wasteful diversion of an estate at the hands of secured creditors who, knowing that the estate must foot the bills, fail to exercise restraint in enforcement expenses. While the criterion must, of necessity, be a general one, and it leaves much to the discretion of the trial judge, it does provide a workable standard. Under it, for instance, Talcott would be entitled to compensation for such services as were reasonably necessary to obtain the appointment of a receiver for the pledged assets, the filing of proofs of claim in the bankruptcy proceeding, the negotiation and arrangement for the sale and liquidation of the security and the taking of such steps as were essential to preserve Continental as a viable business enterprise so that it could be sold as a going concern. On the other hand, Talcott would not be entitled to reimbursement for services that were unnecessary or unconnected with enforcement or collection of the indebtedness, services that would have been incurred by Talcott regardless of its efforts to obtain payment, or services that had little or no chance of achieving the objective of payment....
 
 
 25
 We recognize that to some extent the services rendered to Talcott as a creditor might have duplicated those furnished by other counsel to the trustee in the same matter. However, the fact that the trustee, acting on behalf of the estate, saw fit to provide legal and accounting services in connection with some actions jointly taken by himself and Talcott, did not preclude Talcott from protecting its interest as a secured creditor in obtaining payment, which might differ from that of the estate. However, where the interests of Talcott and the trustee were parallel, the provision of duplicative services by the trustee may be taken into account in appraising the extent and value of the services reasonably necessary to preserve Talcott's interests.
 
 
 26
 543 F.2d at 994 (emphasis added). Judge Babitt erroneously interpreted this final statement as an absolute bar to recovery of the costs of duplicative services.
 
 
 27
 While In re Continental clearly authorizes the court to consider duplication, it does not establish a strict rule that expenses of duplicative services should always be disallowed. Whether and to what extent duplicative services are necessary to protect the interests of the creditor is a question of fact to be determined by the bankruptcy court on a case-by-case basis. The controlling inquiry is whether, considering all relevant factors including duplication, the creditor reasonably believed that the services employed were necessary to protect his interests in the debtor's property. Id. Thus, on remand, the bankruptcy court should permit Equitable and Hancock to attempt to establish that the claimed costs were incurred for services rendered to protect interests that they reasonably believed the Official Committee of Creditors could not or would not protect.
 
 II. Liquidated Damages
 
 28
 Section 11.1 of the loan agreements provides that upon default:
 
 
 29
 then, at the option of the holder of any Note, exercised by written notice to (UM&M), the principal of such Note shall forthwith become due and payable, together with the interest accrued thereon, and, to the extent permitted by law, an amount equal to the pre-payment charge that would be payable if (UM&M) were pre-paying such Note at the time pursuant to P 8.2 hereof.[7]
 
 
 30
 (emphasis added). Equitable and Hancock maintain that this provision entitles them to recover $2,124,750 and $1,779,300, respectively, in liquidated damages. Judge Babitt ruled that section 11.1 is unenforceable under New York law because it provides a penalty rather than true liquidated damages. Judge Babitt held further that enforcement of section 11.1 would contravene the policies of the Bankruptcy Act even if the clause were valid under state law. Thus, on alternative grounds, the bankruptcy court disallowed appellants' claims for liquidated damages. The district court affirmed this ruling "for the reasons stated by Judge Babitt." 10 B.R. at 313. We reverse.
 
 A. New York Law
 
 31
 Whether a contract clause which nominally prescribes liquidated damages is in fact an unenforceable penalty provision is a question of state law. In re Tastyeast, Inc., 126 F.2d 879, 881-82 (3d Cir. 1942); Porreca v. Freeman (In re Oscar Nebal Co.), 117 F.2d 326, 327 (3d Cir. 1941); 3A Collier on Bankruptcy P 63.07(7) at 1811 n.31 (14th ed. 1975). In finding section 11.1 invalid under New York law, the bankruptcy court relied on the following statement in New York Jurisprudence:
 
 
 32
 In case of a contract simply for the payment of money, a stipulation to pay a fixed sum in default of performance will be regarded as an agreement for a penalty, and not as a covenant for liquidated damages. The reason for this rule is that for the nonpayment of money, the law awards interest as damages, and hence there is no difficulty in ascertaining the damages in such case.
 
 
 33
 14 N.Y.Jur. Damages § 167 (1969) (footnote omitted). Our review of New York law leads us to conclude that this statement is inaccurate. The cases cited for the black letter rule in New York Jurisprudence at most state in dicta a general proposition, implicitly subject to exceptions, which finds direct support in no New York cases of which we are aware.[8] Under these circumstances, we decline to accept this encyclopedia's statement of the law.
 
 
 34
 We reviewed the New York law on liquidated damages in Walter E. Heller & Co. v. American Flyers Airlines Corp., 459 F.2d 896, 899 (2d Cir. 1972).
 
 
 35
 (U)nder New York law a contractually agreed upon sum for liquidated damages will be sustained where (1) actual damages may be difficult to determine and (2) the sum stipulated is not "plainly disproportionate" to the possible loss.
 
 
 36
 The bankruptcy court held in the present case:
 
 
 37
 (I)t is not clear that damages in this contract ... were so difficult of ascertainment that a liquidated damages clause, in excess of interest payments, was required, nor has sufficient showing of actual loss indicated, in retrospect, that the determination as made by the parties was accurate. Without showing either of the above, the claimants here cannot show that the pre-payment charge constitutes a valid liquidated damages estimate rather than a prohibited penalty.
 
 
 38
 Bankr.Ct.Op. at 9. We believe the bankruptcy court erred by using hindsight in making this determination. As we recognized in Heller,
 
 
 39
 (U)nder New York law ... the actual damages suffered by the party for whose benefit the clause is inserted in the contract have little relevance to the validity of a liquidated damages clause. The soundness of such a clause is tested in light of the circumstances existing as of the time that the agreement is entered into rather than at the time that the damages are incurred or become payable.... It thus makes no difference whether the actual damages are ultimately higher or lower than the sum stated in the clause ....
 
 
 40
 459 F.2d at 898-99 (citations and footnote omitted). Thus, the bankruptcy court's reference to proof of actual damages is misplaced.[9]
 
 
 41
 In addition, the elements of damage recognized by this Court in Heller are remarkably similar to those claimed by appellants. In Heller a lender sought liquidated damages of approximately $250,000 for breach of a loan agreement for $9,000,000. The damages were payable if the parties failed to consummate the loan agreement through no fault of the lender. In finding the damage provision enforceable under New York law, this Court wrote:
 
 
 42
 First, Heller ( (the lender) ) was faced with the loss of some or all of the interest to which it was entitled under the contract .... Also, even though Heller may not have "set aside any funds" it was, as of the signing of the contract, contractually limiting its lending activities so that the funds to be advanced to American ( (the borrower) ) might be available when needed by American. As was observed by the court below, if the American transaction was not consummated the lender was faced with "the cost and expense of procuring substitute borrower or borrowers and the attendant delay in lending the sums to be lent to American Flyers." Thus, when these factors are considered together with the fact that the sum arrived at was the product of an arms-length transaction between sophisticated businessmen, ably represented by counsel, the sum stated for liquidated damages does not seem to be a sum plainly disproportionate to the possible loss.
 
 
 43
 Moreover, Heller's conceivable losses were not subject to easy calculation. The variables inherent in a lender-borrower relationship arising out of the borrower's need for funds to purchase a nine million dollar jet airplane are numerous and uncertain. Such facts as rate of return, duration of the loan, risk, extent and realizability of collateral, and the other obvious uncertainties inherent in this particular contract combined to make it difficult to foresee, at the time the contract was executed, the extent of damages which might arise from the breach of the loan agreement. Therefore, it was reasonable that a sum for liquidated damages should be agreed to after arms-length negotiations.
 
 
 44
 459 F.2d at 899-900. Virtually all of the factors identified in Heller are present in the instant case, which similarly involves a loan agreement between sophisticated parties for a large sum of money. UM&M cites no authority that would cast doubt on the vitality of Heller, nor does it offer a persuasive ground on which to distinguish our previous holding. Especially in the light of Heller, it is apparent that the potential damages from breach of the loan agreements in this case were difficult to determine. Moreover, it is apparent that the amount stipulated was not "plainly disproportionate to the possible loss." Therefore, we hold that the liquidated damages provisions in the loan agreements in this case are valid under New York law.
 
 B. Bankruptcy Policy
 
 45
 The bankruptcy court held that even assuming the validity of the liquidated damages clauses under New York law, recognition would be contrary to the policies of the Bankruptcy Act. First Judge Babitt found that appellants had suffered no actual damages and, therefore, that the bankruptcy court had the equitable power to ignore the liquidated damages clause. The only evidence presented on the issue of damages was appellants' affidavits showing substantial actual damages. Although UM&M did not refute these affidavits below, Judge Babitt rejected appellants' proof, reasoning:
 
 
 46
 (W)hile the debtor's plan ... provides for payment in full of the amount of unsecured loans over a 47 year period (as opposed to the contracted maturity date of 1992-93), that plan actually provides for repayment of a substantial amount of the principal by 1980-82, thereby mitigating, if not alleviating in full, the loss of the use of their money ....
 
 
 47
 Bankr.Ct.Op. at 10. UM&M takes this reasoning one step further, arguing that appellants are actually better off under the plan of arrangement than they would have been had UM&M continued to pay its obligations according to the terms of the loan agreement. Brief for Appellees at 12-13.
 
 
 48
 If appellants are truly better off because they receive some payments under the plan earlier than they would have under the loan agreements, UM&M, because it must make the early payments, must be worse off. But if this were true, one would have expected UM&M to propose payment according to the terms of the loan agreements as part of the plan. UM&M never did so. While there may be explanations for UM&M's failure to propose such a non-impairment plan, we believe that the burden should be on the party seeking to defeat an otherwise valid liquidated damages clause to prove that no damages were actually suffered before it invokes an equitable doctrine to seek disallowance of such claims in bankruptcy. Here UM&M presented no evidence to contradict appellants' showing of substantial damages. There is nothing in this record from which the bankruptcy court could properly conclude that actual damages were nonexistent.
 
 
 49
 Next, the bankruptcy court held that the effect and purpose of the liquidated damages claims is simply to increase the rate of interest applicable to the outstanding principal: "The short of it is that in styling the pre-payment charge as liquidated damages, claimants really seek to recover interest accruing after the filing of the petition ...." Bankr.Ct.Op. at 13. This, however, is merely another attack on the validity of the provision, which, as we stated above, is determined by state law. As long as the provision is valid under state law, as is the case here, there is no warrant in the statutes or in the case law for rejecting it merely because it is triggered by the filing of a Chapter XI petition rather than by some other event of default.
 
 
 50
 Finally, the bankruptcy court ruled that enforcement of the liquidated damages clauses in this case would result in a forfeiture which "could have a potentially chilling effect on the debtor's liquidity and its ability to honor to all its creditors its future promises in the plan." Bankr.Ct.Op. at 15-16. However, just as appellants' claims for collection costs are based on contract provisions negotiated by equally sophisticated parties bargaining at arms length, see section I, supra, so are the claims for liquidated damages. Such claims are no less enforceable than those for the principal balances of the loan, which arise from other terms of the loan agreements. In asserting these claims, appellants once again merely seek to reap the benefits of a fairly negotiated bargain. Nothing in bankruptcy law or policy counsels against recognition of appellants' claims for liquidated damages.
 
 CONCLUSION
 
 51
 For the reasons stated above, we reverse the judgment of the district court and remand with directions to refer the case to the bankruptcy court for further proceedings not inconsistent with this opinion. Each party shall bear its own costs.
 
 
 
 [1]
 Since UM&M's petitions were filed prior to the October 1, 1979 effective date of the Bankruptcy Reform Act, the former Bankruptcy Act controls this case. Bankruptcy Reform Act of 1978, Pub.L.No.95-598, §§ 402, 403, 92 Stat. 2549, 2682-83 (1978)
 
 
 [2]
 The pertinent provisions of the loan agreements between UM&M and Equitable and UM&M and Hancock are equivalent for all purposes relevant to this appeal
 
 
 [3]
 Section 20 of the loan agreements provides that the agreements are to be governed by New York law
 
 
 [4]
 Section 63(a) of the Bankruptcy Act, 11 U.S.C. § 103 (1976), provides in pertinent part:
 (a) Debts of the bankrupt may be proved and allowed against his estate which are founded upon (1) a fixed liability, as evidenced by a judgment or an instrument in writing, absolutely owing at the time of the filing of the petition by or against him, whether then payable or not, with any interest thereon which would have been recoverable at that date or with a rebate of interest upon such as were not then payable and did not bear interest; ... (4) an open account, or a contract express or implied; ... (8) contingent debts and contingent contractual liabilities; ....
 
 
 [5]
 Cf. Hartman v. Utley, 335 F.2d 558 (9th Cir. 1964) (bankrupt contractor's contractual obligation to indemnify insurance company which executed a surety bond to guarantee payment of materialmen and laborers for attorney's fees incurred in defending claims arising under the bond was source of an allowable claim under section 63 of the Bankruptcy Act)
 
 
 [6]
 Of course, section 506(b) of the Bankruptcy Reform Act, 11 U.S.C. § 506(b) (Supp. III 1979 & Supp. IV 1980), does not govern this case. See note 1 supra. UM&M cites section 506 as persuasive authority
 
 
 [7]
 Section 8.2 of the loan agreements provides UM&M an option to prepay all or a portion of the amounts outstanding upon payment of a prepayment charge to the creditor. The prepayment charge is to be calculated by a formula set forth in section 8.2. UM&M presents the specious argument that since the filing of its Chapter XI petition is not prepayment within the meaning of section 8.2, appellants cannot recover prepayment charges. It is quite clear, however, that section 11.1 merely incorporates the formula contained in section 8.2 as a measure of liquidated damages in the event of default. The fact that the filing of the bankruptcy petition is not "prepayment" is therefore, irrelevant
 
 
 [8]
 New York Jurisprudence cites four cases to support its view of the state's law
 In Manhattan Syndicate, Inc. v. Ryan, 14 A.D.2d 323, 220 N.Y.S.2d 337 (1st Dep't 1961), the parties to a five-year lease of real property entered into a separate agreement under which the landlord paid $10,500 for an option to terminate the lease on 60 days notice to the tenants. The agreement provided that if the tenants breached the underlying lease agreement the landlord could recover the price paid for the option. Later, the tenants became delinquent in the payment of rent and the landlord brought summary eviction proceedings. After the tenants tendered and the landlord accepted the entire back rent and the eviction proceedings were dismissed, the landlord sued to recover the $10,500 he had paid for the option, notwithstanding his concession that the lease continued in full force.
 The Appellate Division, Breitel, J., ruled that the trial court had properly denied cross motions for summary judgment because factual issues remained unresolved. The court observed in dictum that the landlord had other remedies available to cure the tenants' breach and that recovery of the option price might constitute a penal forfeiture. Again in dictum, the court observed that the tenants' breach was a failure to pay rent on time and noted the "relevant general rule that a failure to pay a sum of money due will rarely, if ever, justify a further sum, in excess of interest, to be paid by way of liquidated damages." 14 A.D.2d at 327, 220 N.Y.S.2d at 340.
 Thus, in Manhattan Syndicate the court merely remanded the case for further proceedings suggesting that a "general rule" (incorrectly stated in N.Y. Jurisprudence as an absolute dictate) might apply.
 In Fairfield Lease Corp. v. Marsi Dress Corp., 60 Misc.2d 363, 303 N.Y.S.2d 179 (Civ.Ct.N.Y.1969), a lessor of a coffee vending machine who took the machine back upon the lessee's default sought to enforce a clause in the lease agreement permitting it to accelerate all future rental payments. The court noted the distinction between the acceleration clause in this rental agreement, which brought due future payments before the lessor had furnished the consideration, and one in an ordinary loan agreement which merely accelerates payments for consideration already furnished. The court quite understandably found a clause of the former type to an unenforceable agreement for a penalty.
 In Gilad Realty Corp. v. Ripley Pitkin Ave., Inc., 48 A.D.2d 683, 368 N.Y.S.2d 228 (2d Dep't 1975), the court refused to enforce a provision in a 21-year lease agreement that required the tenant to pay an additional monthly charge for 225 past and six future months because he defaulted in payment of rent when there were just six months remaining on the lease. Under the agreement, the tenant would have to have paid approximately eight times the amount of delinquent payments. The penal nature of this clause is apparent.
 Finally, In Cotheal v. Talmage, 9 N.Y. 551 (1854), the court enforced a liquidated damages clause, but referred in dictum to the general rule that liquidated damages in a contract to pay money will be regarded as a penalty. The court placed great emphasis, however, on honoring the intention of the parties and stated:
 Where there is manifest difficulty in ascertaining damages arising from the breach of the contract, and the fair conclusion is, that the amount is specified and agreed on, for the purpose of saving the expense or avoiding the difficulty of proving the actual damages, the parties should be held to their bargain ....
 
 
 [9]
 N.Y. at 554. Given the court's focus on the general requirements of a valid liquidated damages clause and the particular emphasis on the intention of the parties, we do not view the dictum, over a century and a quarter old, as an authoritative statement of prevailing New York law
 
 
 [9]
 Even if actual damages were relevant to the validity of a liquidated damages clause, the bankruptcy court's conclusion that appellants suffered no damages is without evidentiary support. See section II B infra