**Surinder K. TREHAN and Grace Trehan, Plaintiffs,**

v.

**Anton VON TARKANYI, Defendant.**

No. M–47 (MP).
Bankruptcy Nos. 81 B10161 (BL), 81–5656–A (BL).

United States District Court, S.D. New York.

Aug. 28, 1986.

Nachamie, Kirschner, Levine, Spizz & Goldberg, New York City by Alex Spizz, for plaintiffs.

Farber & Cohen, New York City by Elliott Cohen, for defendant.

## OPINION AND FINDINGS

MILTON POLLACK, Senior District Judge.

This is a motion by defendant Von Tarkanyi, pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, to set aside as void a default judgment for $450,000 entered on August 30, 1982, in an adversary proceeding in the Bankruptcy Court. The judgment was entered against Von Tarkanyi without the notice required by Rule 755 of the Bankruptcy Rules of Procedure, and without an inquest to assess the amount of damages, although an unliquidated sum was claimed. In November 1985, the defendant attempted to obtain relief from the judgment in the Bankruptcy Court; however, Bankruptcy Judge Lifland, professing to be without competence to grant relief, denied defendant's motion as untimely.

■ A detailed investigation of the factual circumstances of the case indicates that the Bankruptcy Judge overlooked or misperceived his power to rectify a complaint of remediable injustice complained of by the defendant. Given the continuous stream of fundamental irregularities which pervaded this case—including the lack of the required notice of the application for and entry of a default judgment and the failure to hold an inquest to ascertain if there were any recoverable damages—it appears that the Bankruptcy Judge gravely misapprehended the record and the apparently void character of the judgment entered thereon. In addition, the Judge failed to consider whether, in light of the matters of record before him, the conduct complained of was tantamount to a fraud on the Court. The Bankruptcy Judge possessed the authority and could have overturned the judgment, if findings sustained either of these asserted grounds since a void judgment, *see Crosby v. Bradstreet Co.,* 312 F.2d 483 (2d Cir.1963) (vacating void judgment 30 years after entry); 7 *Moore's Federal Practice,* ¶ 60.25[2], [4] (stating that a void judgment cannot acquire validity because of laches on the part of the judgment debtor); Wright & Miller, *Federal Practice and Procedure,* § 2862 (same), or one secured by fraud on the Court can be set aside at any time, even if the moving party is guilty of laches. *See Hazel-Atlas Glass Co. v. Hartford Empire Co.,* 322 U.S. 238, 246, 64 S.Ct. 997, 1001, 88 L.Ed. 1250 (1944); 7 *Moore's Federal Practice,* ¶ 60.33 at 60–355 (stating that there is no time limit on a court's inherent power to overturn a judgment for fraud on the court).

■ Accordingly, the case will be remanded to the Bankruptcy Judge for renewal and reconsideration before him of the evidence pertinent to the issues raised on the motion to vacate the judgment which he was, contrary to his mistaken beliefs, legally competent and required to entertain. *Cf. Friedman v. Snelling,* 526 F.2d 1346 (1st Cir.1975) (upholding district court's supervisory or equitable power to upset or modify prior orders of bankruptcy court); 7 *Moore's Federal Practice* ¶ 60.36 at 60–366 (stating that federal courts have equitable power to enjoin or otherwise grant relief from a judgment by another federal court). This Court will retain jurisdiction of the matter pending receipt of the determination made on such renewal and reconsideration by the Bankruptcy Judge in the first instance.

The background of this case is as follows:

Defendant Von Tarkanyi is a citizen of New Zealand. In 1981, he resided in Australia and was employed by an Australian corporation. He was also President of a Delaware corporation, Unigulf Petroleum Inc. ("Unigulf"),[1] which had an office in New York in 1981, but only for a few months.

In June 1981, the defendant came to the United States to investigate investment opportunities for Unigulf. He stayed at a mid-town hotel in New York. He also looked into the possibility of acquiring an apartment for Unigulf for use by corporate officers coming into New York.

In July 1981, a real estate broker showed Von Tarkanyi apartment 14–A, located in a cooperative building at 435 East 52nd Street in New York. At this time, Von Tarkanyi also met with Mr. Trehan ("Trehan"), the owner of the apartment, to discuss the terms of sale. The parties discussed an agreement of sale calling for a purchase price of $1,900,000, of which $19,000 was to be escrowed at the time the agreement was signed, and $171,000 was to be paid 45 days later. The contract was to be conditioned on the defendant obtaining mortgage financing of $1,425,000 by September 30, 1981, and on the cooperative board's approval of the sale. In addition, the contract was to contain a liquidated damage clause which fixed the amount of damages for purchaser's default at $19,000.

During the discussions, according to Von Tarkanyi, Trehan never revealed the fact that he and his wife ("the Trehans") had declared bankruptcy in January 1981 and that they were presently in the midst of bankruptcy proceedings. This meant that the Trehans lacked authority to sell the apartment without the Bankruptcy Court's approval and order; such approval was never obtained.

A form of contract was prepared, but it was never finalized or signed by Von Tarkanyi or Unigulf. When Von Tarkanyi left New York to return to Australia on August 4, 1981, he did not execute the form of contract prepared for the transaction. Within days of Von Tarkanyi's departure, Trehan visited Unigulf's office, where he spoke to Trevor Bailey, a corporate officer of Unigulf in charge of exploration activities. Trehan presented Bailey with a printed form of contract of sale for the apartment and told him that it must be signed immediately, so that the board of directors of the cooperative apartment could be asked to consider whether it would approve such a sale. Trehan assured Bailey, according to the latter, that the document was "purely for an approval procedure with this Co-op house." In Von Tarkanyi's absence and without his knowledge or authorization, Bailey obliged and executed three copies of a printed form of sales contract dated August 7, 1981, by signing "per proc" for Von Tarkanyi, and affixing Von Tarkanyi's name, followed by his own. However, Bailey never exhibited, nor did he in fact have any power of attorney to sign on Von Tarkanyi's behalf.

Bailey was also asked to provide a check for $19,000 to Sulzberger Rolfe, the real estate broker for the apartment. He drew a corporate check, dated August 5, 1981, to Sulzberger Rolfe; accompanying the check was a letter from a Washington attorney, Lester Hyman, stating that "the check will be held in escrow by the broker, ... without negotiating same." The letter also stated that if a mutually acceptable purchase and sale agreement was not negotiated within the next twenty-one days, the deposit would be returned.[2] A second corporate check to the same broker in the amount of $171,000 was later supplied by Lon Ostrow, another corporate officer of

---

1. Unigulf was affiliated with the Australian corporation through defendant's common stock ownership.

2. The check was a Unigulf corporate check which, pursuant to corporate charter, required two signatures. Bailey was the only signator; a second signature was never obtained therefor.

Unigulf. That check, dated August 13, 1981, was drawn on a Middle East bank.[3]

The purported contract obligated the parties to obtain approval of the sale from the cooperative board and expressly provided in clause "6" that the alleged contract was void and that neither party to the contract was liable to the other, if approval was not obtained. Nothing relating to the purported contract was ever presented to the board of the cooperative for consideration and no approval was ever obtained.

In an affidavit filed with the Bankruptcy Judge, sworn to by Trehan on August 24, 1981, Trehan stated "When the contract was signed, Mr. Tarkanyi was in Australia and was unable to personally sign the contract. It was signed by his business partner, Mr. Bailey, who the debtor was informed had the power of attorney to execute the document on behalf of Mr. Tarkanyi." "I then personally contacted Mr. Bailey in an attempt to obtain a copy of the power of attorney to attach to the motion papers [to be sent out to all creditors.] It was then that I discovered for the first time ... that the power of attorney given to Mr. Bailey from Mr. Tarkanyi related only to corporate matters of Unigulf Petroleum Inc. of which Mr. Tarkanyi is the chief executive officer."

In mid August, Trehan contacted Von Tarkanyi in Australia by telex and telephone and requested that he authorize Bailey to enter into a contract of sale. Von Tarkanyi says that he told Trehan that Bailey was not authorized to execute any documents on his or on Unigulf's behalf and that nothing further should be done in connection with the apartment until he returned to New York.

Nonetheless, the Trehans' attorney, Mr. Spizz, appeared before the Bankruptcy Court on August 12, 1981, and represented to the Judge that the Trehans had found a purchaser for the cooperative apartment; that a valid contract of sale had been executed by Bailey, on Von Tarkanyi's behalf; and that a duly executed power of attorney authorizing Bailey to enter into the contract of sale had been signed by Von Tarkanyi and would be presented to the creditors and to the Court. In the face of skepticism expressed by the Trehans' creditors as to the existence and validity of the alleged contract of sale, of the purported purchaser and of a signed power of attorney to Bailey, the Bankruptcy Judge ordered Spizz to produce the contract and the power of attorney in court. Spizz turned over a copy of the contract, but told the creditors that he had not procured the demanded power of attorney.

Initially, the contract dated August 7, 1981 and signed by Bailey had a September 30, 1981 closing date and was subject to the contingency of procuring a mortgage for $1,425,000 from a satisfactory institutional lender. On being apprised thereof, Trehan's creditors stated, however, that they would only approve an all cash sale of the apartment. The Trehans were told that the apartment would be auctioned by the Bankruptcy Court, if the terms of sale were not approved by the creditors. To avoid this result, Spizz represented to the Bankruptcy Judge on August 25th that Von Tarkanyi's offer had been changed to an all cash deal—but in fact, there never was such a committment from Von Tarkanyi.

On August 27, Spizz submitted to the Court what purported to be an amended contract which he stated had been executed by Bailey on August 27, 1981.[4] In actuali-

---

3. This check was also a Unigulf check, but was drawn upon the British Bank of the Middle East and signed by Ostrow. Mr. Von Tarkanyi testified that Ostrow was not authorized to sign checks on Unigulf's Middle Eastern account.

4. Bailey testified that he never signed an amended contract and further, that it was impossible for him to have signed the document on August 27, 1981 since he was not in the United States on that date. Bailey said that the only doc-

uments he signed in connection with the apartment were two identical copies of a form of contract of sale which he signed on August 7, 1981 mentioned above, and that none of the printed clauses, including the mortgage contingency clause had been stricken therefrom.

An examination of the alleged "amended" contract reveals that it is a mere duplicate of the August 7th contract; it is dated August 7, 1981, not August 27th as alleged by plaintiffs, and it

ty, as admitted by Trehan, the document was the original contract with inked-in modifications. Spizz also represented that the mortgage contingency clause, section 21 of the "amended" contract, was deleted, thus purporting to convert the transaction to an all cash deal.[5]

Spizz never produced a signed, duly executed power of attorney from Von Tarkanyi authorizing Bailey to execute a contract of sale for the apartment. Instead, he submitted an unsigned telex, dated August 26, 1981, with a printed notation "From: Anton Von Tarkanyi".[6] The telex read "cfming yr specific power of attorney to execute documents per my purchase of apartment in 'River House' for one million nine hundred thousand dollars."

The Trehans' creditors expressed doubt as to the existence of a valid contract of sale and of a valid power of attorney from Von Tarkanyi personally. Counsel for one creditor even charged "there is no $1.9 million, it is apparent that there never was any such figure as I told the court originally, that this person never had the money to pay for it, never wanted it, there was never a deposit, there was never a contract that he signed or authorized." (September 7, 1981 Hearing at 8) Counsel for another creditor complained "we have all been misled with regard to the Von Tercouni (sic) offer. Where is he? Where is anybody representing Mr. Von Tercouni (sic)?" (*Id.* at 12) The Bankruptcy Judge expressed concern "as to whether this is a phantom bidder or not." (*Id.* at 13) The Judge then

ordered advertisement for sale of the apartment and the submission of bids to the Court for consideration and approval.

Von Tarkanyi returned to New York on August 28, 1981, unaware of the events which had transpired. Upon his return, he says that he learned for the first time that the Trehans were in bankruptcy and that a mortgage of $1,425,000 could not be obtained. Because of these developments, Von Tarkanyi could and properly did believe that negotiations for the apartment were at an end; Von Tarkanyi was told that the Trehans had been so advised.

The Trehans then obtained and reported a proposed contract to sell the cooperative apartment to Ella Cisneros for $1,450,000, all cash. That figure was consistent with an independent appraisal of the property ordered and obtained by the Bankruptcy Judge; the appraisal reported that the premises were worth $1,400,000. No other validated bid came before the Court. A sale to Cisneros was then approved by the Bankruptcy Judge on September 21, 1981 and when that contract came before the cooperative board, the board approved that sale and that purchaser. Spizz handled the transaction.

On October 6, 1981, a day after Von Tarkanyi left New York, the Trehans filed an adversary proceeding in the Bankruptcy Court against Von Tarkanyi and made service by regular mail addressed to the Unigulf office in New York; the com-

contains the printed language identical to the August 7th contract, except for two minor changes: in section 3, the $171,000 to be held in escrow were not to be due until 75 days after the agreement is signed, instead of 45 days after; and the closing date in section 10 was amended to read October 30, 1981, instead of September 30, 1981.

**5.** This representation is suspect. The printed contract provided that "the obligations of Purchaser hereunder are subject: (a) to the issuance of a committment letter by [any financial institution agreeing] to lend not less than $1,425,000 ..." and that absent such a committment, Purchaser shall have the right to terminate the contract and "all sums paid on account of the purchase price shall be returned ... and

all parties hereto shall be relieved of and from any further liability hereunder." Although this paragraph was crossed out on the purported amended contract, the words "stet as to ¶ a" appear in the margin next to the clause, initialled by Trehan, indicating that the paragraph is to stand.

**6.** Von Tarkanyi denied sending or authorizing the transmission of this telex. Moreover, the sender identification number on the telex, no. AA72566, is not Unigulf's Australian telex number. It is the number of ServeCorp., an Australian company which has its offices in the same building as Unigulf. The transmitter of the purported telex was never identified.

plaint was received by Trevor Bailey.[7] The complaint alleged that Von Tarkanyi had breached the so-called amended contract of sale, supposedly signed by Bailey on August 27, 1981, and sought the sum of $450,-000, the difference between the price in the form of contract signed by Bailey "per proc" and the approved price for which the apartment was actually sold to Cisneros.

The complaint, signed by Spizz on the Trehans' behalf, contained numerous misrepresentations and omissions of material facts, necessary to prevent the statements contained therein from being misleading. The complaint failed to disclose the fact that defendant's obligations under the contract were expressly conditioned on the approval of the sale by the cooperative board, and that such approval was never sought or obtained. Additionally, the complaint omitted the fact that the Bankruptcy Court had never considered or approved a sale to Von Tarkanyi, even though such approval by the creditors and the Court was essential to a disposition of an asset in bankruptcy.

These facts were clearly known to plaintiffs' attorney, Mr. Spizz. At a hearing before the Bankruptcy Court on August 12, 1981 Mr. Spizz acknowledged that the alleged contract signed by Bailey provided that the purchase was subject to the approval of the Board of Directors of the cooperative, (August 12, 1981 hearing at 14), and that there was no binding contract without the approval of the bankruptcy court, which was never given. (*Id.* at 5).

Moreover, the complaint stated that the mortgage financing clause, section 21 of the August 7th and of the so-called amended contract, had been excised from the contract, with the defendant's consent. This allegation was unsupportable on its face since the word "stet", initialled by Trehan, clearly appears in the margin next to section 21—indicating that the clause should stand. In addition, section 3 of both the original and "amended" contracts, unequivocally states that satisfaction of section 21, the mortgage financing contingency clause, is an express condition of the contract and of the escrowed holding of the deposited checks.

 Finally, the complaint did not reveal the fact that each contract contained a liquidated damage clause limiting liability for purchaser's default to the non-negotiable $19,000 check delivered; the complaint, nonetheless, demanded $450,000 in damages, representing the paper difference between the Von Tarkanyi and Cisneros "contracts".[8]

7. Rule 704(c)(1) of the Bankruptcy Rules of Procedure provides that service of a summons and complaint may be made within the United States, upon an individual by mailing a copy of the summon and complaint, by first class mail postage prepaid, to his dwelling house or usual place of abode or to the place where he *regularly conducts his business* or profession. The Bankruptcy court acquires jurisdiction over the defendant when a complaint is properly served by mail pursuant to this Rule. *See In re International Coins & Currency, Inc.,* 22 B.R. 121 (D.Vt.1982); *In re Schack Glass Industries Co., Inc.,* 20 B.R. 967, 970 (S.D.N.Y.1982).

In the case at bar, the complaint was served by regular mail to the Unigulf office. Von Tarkanyi testified that he did not regularly conduct his business at the Unigulf office in New York; thus, such service of process was invalid and ineffective in conferring personal jurisdiction over him. Where service of process is defective, the judgment rendered is void and subject to collateral attack. *See Leab v. Streit,* 584 F.Supp. 748, 760 (S.D.N.Y.1984) However, any jurisdictional defect would have been waived by Von Tarkanyi's appearance in the action or the authorized appearance of an attorney on his behalf. *See infra* note 9 for further discussion of this issue.

8. On the basis of these incorrect and misleading statements in the complaint and the omissions of material facts, plaintiffs induced the Judge to sign a default judgment for $450,000, without even having an inquest on damages. It is well established that a court has the inherent power to grant relief from a judgment which has been secured by a "fraud on the court.". *See Universal Oil Products Co. v. Root Refining Co.,* 328 U.S. 575, 580, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447 (1946). The concept of "fraud on the court" embraces "only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication,...." 7 *Moore's Federal Practice* ¶ 60.33 at 60–360. *See Serzysko v. Chase Manhattan Bank,* 461 F.2d 699, 702 (2d Cir.1972).

It was not until Von Tarkanyi returned to New York in late October, that he learned of the action. It was then that Von Tarkanyi also learned for the first time that Bailey had signed a contract of sale for the apartment, without authority, and had delivered an incompletely signed corporate check for $19,000, to be held and not negotiated. Although Von Tarkanyi was aware that a suit had been brought, he says that he was never shown a copy of the complaint and that he was under the belief that the suit involved the attempted assertion of the corporation's liability for the $19,000 corporate check, not his personal liability.

In late October 1981, Von Tarkanyi discussed the factual background of the case with Bailey and Leon Harris, an attorney who represented Unigulf in another matter. Harris says that he told Von Tarkanyi that the only exposure might relate to the dishonored corporate check for $19,000. This was the only meeting which he had with Harris, and shortly after this meeting, Von Tarkanyi left New York.

On October 30, 1981, Leon Harris filed an answer to the complaint on Von Tarkanyi's behalf. The answer admitted that Von Tarkanyi was a "resident" of New York; Harris explained that the basis for this answer was that Von Tarkanyi was a guest of the Park Lane Hotel. Von Tarkanyi did not participate in the preparation of the answer. Moreover, Von Tarkanyi claims that he never retained Harris's services on his personal behalf. The only communication which took place between Harris and Von Tarkanyi that year was the meeting referred to above and possibly a few phone calls in November and December 1981.[9]

On March 1, 1982, plaintiff served a Notice to take the deposition of defendant in New York returnable March 16, 1982. It is not disputed that defendant was not then in the United States and that Harris had not heard from him in months. The notice was sent to Harris' law firm; Von Tarkanyi was never notified that his deposition was then sought or of the return date of the notice. Von Tarkanyi did not appear for a deposition on March 16, 1982.[10]

An attorney is an officer of the court and owes the court fiduciary duties and loyalty. When an attorney misrepresents or omits material facts to the court, or acts on a client's perjury or distortion of evidence, his conduct may constitute a fraud on the court. See *Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) (finding fraud on the court where plaintiff's attorney used a forged article to support his claim for patent infringement); *H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1119 (6th Cir.1976) (stating that an attorney's knowledge and sponsorship of his client's nondisclosure, misrepresentation and perjury would constitute a fraud on the court); *Kupferman v. Consolidated Research & Manufacturing Corp.*, 459 F.2d 1072, 1078 (2d Cir.1972) (stating that an attorney's failure to disclose the existence of a release which he knew was a full defense to plaintiff's claim would fit within the concept of fraud on the court); *Bulloch v. United States*, 95 F.R.D. 123 (D.Utah 1982) (finding fraud on the court where the government and its attorneys made false and deceptive representations, withheld information, and pressured witnesses not to testify).

The Trehans and their attorney, Spizz, failed to disclose to the Court that the purported contract of sale for the apartment was conditioned on the cooperative board's approval and that it contained a liquidated damage clause fixing damages at $19,000. In addition, they stated that the mortgage contingency clause, which expressly conditioned the purchaser's obligations under the contract on obtaining a mortgage for $1,425,000, was excised. Their conduct appears to reach the level which may permit a finding of a fraud on the court. The Bankruptcy Court, if it so finds on scrutiny of the facts, thus has the authority to set aside the default judgment on this basis alone.

9. If Mr. Harris's appearance was authorized by the defendant, then any defect in personal jurisdiction was waived. See *Wickham v. Liberty Mutual Insurance Co.*, 73 A.D.2d 742, 423 N.Y. S.2d 273 (3d Dept.1979). If, however, Mr. Harris was not authorized to represent the defendant in the action, then his appearance would not constitute a waiver of any jurisdictional defect, and any such defect could be challenged subsequently. *Id.*

10. It is questionable whether Von Tarkanyi, a resident of Australia and a citizen of New Zealand, could be required to appear in New York for a deposition. Since a defendant does not choose the litigation forum, it is generally held that the usual and proper place for examining a defendant is at his place of residence or business, not where the action is pending. *See*

On June 17, 1982, plaintiffs moved, pursuant to Rule 737 of the Rules of Bankruptcy Procedure and Rule 37 of the Federal Rules of Civil Procedure, to strike the defendant's answer and to prohibit defendant from opposing plaintiffs' claim for his failure to appear in March at the scheduled deposition.

On June 21, 1982, Leon Harris's law firm, Northrop & Jessop, Esqs. cross-moved for an order granting them leave to withdraw as counsel for defendant. In his affidavit in support of the motion, Harris stated that he had not been in contact with Von Tarkanyi for the last 6 months and had not been compensated for his services.

The Bankruptcy Judge signed an order dated July 29, 1982 striking the defendant's answer, unless the defendant appeared for deposition on August 23, 1982. Additionally, the order relieved Northrop & Jessop, Esqs. as counsel for defendant "as of August 23, 1982, by which time the defendant has had an opportunity to retain new counsel, upon the condition that the said firm of Northrop & Jessop serve a copy of this Order, with Notice of Entry, upon the defendant."

Mr. Harris's firm sent Von Tarkanyi in Australia a letter dated July 30, 1982 and a telex dated July 29, 1982. The letter stated: "An order will issue requiring you to appear for a deposition within 30 days after the date of the order.... the order has not yet been signed and therefore the 30 days period has not commenced running. It is anticipated that the order will be signed shortly. When we receive a copy of the order it will be forwarded to you at the same address indicated in this letter." The order itself was mailed only on August 13, 1982, according to the affidavit of service annexed thereto. No evidence was adduced to show receipt of the order or the date thereof. Von Tarkanyi testified that it was not received.

Von Tarkanyi did not appear on August 23, 1982. On plaintiff's application, without notice to defendant or to his former lawyer (no proof of service made), the Bankruptcy Judge signed an order on August 30, submitted on the affidavit of Spizz, striking defendant's answer, prohibiting defendant from opposing plaintiffs' claim, and directing "that the plaintiffs be allowed to enter judgment against the defendant Anton Von Tarkanyi, for the amount demanded in the complaint." No notice of this order and of the judgment submitted thereon was furnished to defendant or his former lawyers.

■■■ On this same date, despite the fact that no contract of sale with Von Tarkanyi was ever approved by either the Bankruptcy Court or the cooperative's board, as required,[11] and that section 21, providing for a mortgage financing contingency, was not satisfied, judgment was summarily entered by the Judge against Von Tarkanyi for $450,000, without an inquest or any substitute therefor, albeit that if any damages were due they were for an unliquidated sum for breach of contract. Such an award, without an inquest, renders the judgment void.[12] Notice of this judg-

---

*Thompson v. Sun Oil,* 523 F.2d 647 (8th Cir. 1975); *In re Martin Baker Well Drilling, Inc.,* 36 B.R. 151, 153 (Bankruptcy D.Me.1983) (holding, in an adversary proceeding in bankruptcy court, that defendant must be deposed at his place of residence); *Huynh v. Werke,* 90 F.R.D. 447 (S.D. Ohio 1981) (holding that West German defendant was to be examined in West Germany at his place of business); *Grey v. Continental Marketing Associates, Inc.,* 315 F.Supp. 826 (N.D.Ga. 1970); *Kurt M. Jochmann Co. v. Hartley, Cooper and Co.,* 16 F.R.D. 565 (S.D.N.Y.1954); 4 *Moore's Federal Practice* ¶ 26.70.

**11.** Where the terms of a contract of sale for a cooperative apartment provide that the purchase is subject to the approval of the coopera-

tive board and such approval is not obtained, the contract is considered to be terminated and there can be no finding that defendant breached the contract. *See Shandler v. Bauz,* App.Div., 503 N.Y.S.2d 648 (2d Dept.1986).

**12.** It is well-established that a Judge may not enter a default judgment for an unliquidated sum without a hearing or inquest to ascertain the amount of damages. *See G & C Merriam Co. v. Webster Dictionary,* 639 F.2d 29 (1st Cir. 1980); *Eisler v. Stritzler,* 535 F.2d 148 (1st Cir. 1976); *Flaks v. Koegel,* 504 F.2d 702, 707 (2d Cir.1974); *Davis v. National Mortgage,* 320 F.2d 90 (2d Cir.1963).

The effect of a default judgment is to establish as proven all well-pleaded allegations. *See Mee-*

ment or its entry was not given to Von Tarkanyi.

Finally, the sum awarded unconscionably exceeded the amount provided for by the liquidated damage clause in the alleged contract, if that were part of an enforcible contract.[13]

In addition to these fundamental improprieties, the defendant was never notified of the entry of the default judgment or served with a copy of the judgment,[14] as is clearly required by Rule 755 of the Rules of Bankruptcy Procedure.[15] Compliance with this rule is especially im-

*han v. Snow,* 494 F.Supp. 690, 698 (S.D.N.Y. 1980). Although a default constitutes an admission of liability, the quantum of damages remain to be established by proof. *See Flaks,* 504 F.2d at 707. "[A] defaulting party loses his defenses against the claim, but the claim should only be for the amount of damages actually suffered." *Paxson v. Rice,* 706 P.2d 123, 125 (Mont.1985). It would be a blatant injustice to merely accept the amount of damages requested by plaintiff as the appropriate remedy without substantiating evidence. Accordingly, the plaintiff is required to introduce evidence to prove the extent of damages and, based on this evidence, the court must determine whether the relief requested flows from the facts. *See Flaks,* 504 F.2d at 707; *Meehan,* 494 F.Supp. at 698.

A judgment granted without an inquest to assess damages is void. *See Meehan,* 494 F.Supp. at 698 ("A judgment granted withou assessing planitiff's right to relief requested is a nullity.") *Rappazzo v. Nardacci,* 20 Misc.2d 301, 198 N.Y.S.2d 357 (1959) (holding that a default judgment entered without holding an inquest is void and granting defendant's motion to vacate and set aside the judgment on this basis). *See also Insurance Co. of North America v. S/S Hellenic Challenger,* 88 F.R.D. 545, 549 (S.D.N.Y. 1980) (granting motion to vacate default judgment where judgment was entered without an inquest).

Because the default judgment against Von Tarkanyi was entered without holding an inquest, it was void. Therefore, it must be set aside or, at the very least, in proper circumstances, which do not exist here, a judgment so entered must be reopened in order to hold an inquest on damages. *See Collex Inc. v. Walsh,* 74 F.R.D. 443, 449 (E.D.Pa.1977) (reopening a default judgment entered without an inquest for the limited purpose of allowing the defendant to litigate the amount of damages); *Wine Antiques, Inc. v. St. Paul Fire & Marine Insurance Co.,* 40 A.D.2d 657, 336 N.Y.S.2d 550 (1st Dept.1972) (granting motion to vacate default judgment for failure of plaintiff to present adequate proof as to recovery of damages and remanding case for assessment of damages).

**13.** The validity of a liquidated damage clause included in a contract is a question of state law. *See In re United Merchants & Manufacturers, Inc.,* 674 F.2d 134, 141 (2d Cir.1982). The liquidated damage provision contained in Section 15 of the amended contract satisfies the requirements of enforceability under New York law;

namely, that the actual damages for default of the contract may be difficult to determine and that the sum stipulated is not "plainly disproportionate" to the possible loss. *See id.* at 142. The Bankruptcy Court was therefore required to enforce the provision. *See id.* at 143.

**14.** Pursuant to Bankruptcy Rule 705, when a party is in default, service of pleadings and notice is to be made directly on the party.

**15.** Failure to notify a defendant of the entry of a default judgment is a serious procedural defect which "together with other irregularities shown by the facts of a particular case may render the judgment void, ..." *Winfield Associates, Inc. v. Stonecipher,* 429 F.2d 1087, 1091 (10th Cir. 1970). *See 7 Moore's Federal Practice* ¶ 60.25[2] at 60–238. *Cf. Press v. Forest Laboratories, Inc.,* 45 F.R.D. 354 (S.D.N.Y.1968) (holding that a default judgment entered without notice must be vacated as a matter of law); *Ken-Mar Airpark, Inc. v. Toth Aircraft & Accessories Co.,* 12 F.R.D. 399 (W.D.Missouri 1952) (holding that failure to give notice by itself constitutes a violation of due process and renders the judgment a nullity). The lack of notice is to be considered in light of all of the surrounding circumstances and other facts of record, to determine if the judgment is void. *See Collex, Inc. v. Walsh,* 74 F.R.D. 443 (E.D.Pa.1977); *United States v. Martin,* 395 F.Supp. 954, 961 (S.D.N.Y.1975).

In the case at bar, there were numerous procedural defects. Von Tarkanyi never received notice of the pretrial motions and orders in the case, including the notice of deposition, the motion to strike defendant's answer for failure to appear at the scheduled deposition, and the order striking defendant's answer and prohibiting the defendant from contesting plaintiffs' claim. In addition, the court failed to hold an inquest to ascertain the amount of damages, although an unliquidated sum was sought. Moreover, the complaint on which the default judgment was based was filled with misrepresentations and omissions of material facts, raising the question whether there was a fraud on the court. The seeming procedural improprieties which pervaded these proceedings, combined with the failure to notify the defendant of the entry of the default judgment are sufficient to have deprived Von Tarkanyi of due process of law and rendered the default judgment void. *See Bass v. Hoagland,* 172 F.2d 205 (5th Cir. 1949) (holding that a default judgment was void

portant in a case where the defendant was unaware that he was being sued personally and was not served with copies of prior motions or orders in the case. In fact, according to the Advisory Committee's Notes, this rule was specifically designed to safeguard against the possibility that service of the summons, complaint, and notice of pretrial motions failed to come to the attention of the defendant.

Von Tarkanyi did not learn that a default judgment had been entered against him until September 11, 1983, when an article appeared in the Sunday Telegraph, an Australian newspaper, stating that there was a $450,000 judgment against him in the Southern District of New York. Immediately thereafter, Von Tarkanyi hired an Australian attorney to enjoin the publication of these articles since he believed that they were defamatory. On September 12, 1983, Von Tarkanyi's attorney telexed Spizz inquiring about the purported judgment against Von Tarkanyi. Spizz responded by telex on September 19, 1983 and advised Von Tarkanyi's attorney that the Trehans possessed a valid judgment and intended to pursue "all avenues in order to collect the full amount of this judgment."

On August 8, 1984, Trehan commenced formal enforcement proceedings in Australia.[16] The Australian Court adjourned the proceedings so that Von Tarkanyi could attempt to set aside the default judgment and have a full hearing on the merits of the case in the United States. It is in this context that Von Tarkanyi moved, on November 25, 1985, to reopen the Bankruptcy Court proceeding and to set aside the default judgment as void.

On February 28, 1986, after oral argument, Bankruptcy Judge Lifland denied the motion, stating that "it was too little, too late" and that "[t]here [was] no basis … to reconsider the damages at this moment in time."

Von Tarkanyi then moved this Court on March 20, 1986, for an order to show cause why the default judgment should not be vacated. This Court held a hearing on June 25 and August 21, 1986 to ascertain the facts and circumstances which led to the entry of the default judgment and the subsequent motion to vacate.

In light of the procedural improprieties which pervaded these proceedings, and the omissions and misrepresentations made by the plaintiffs and their counsel in the complaint, and renewed by them in the hearings and subsequent affidavits addressed to both the Bankruptcy Court and this Court, a gross injustice may have resulted. The case is therefore remanded to the Bankruptcy Court to reconsider anew whether the default judgment is void and whether there was a fraud on the court, requiring that the judgment be set aside. The Court should also consider whether Rule 11 of the Federal Rules of Civil Procedure is applicable and should be invoked against the Trehans and their attorneys, given the irregularities which occurred and the renewal of these improprieties by plaintiffs and their counsel as late as February 1986.

Jurisdiction will be retained by this Court pending the renewal and reconsideration directed hereby.

Good and sufficient cause therefor as set forth above, it is meanwhile,

for lack of due process where the defendant had no notice of the default, no opportunity to present evidence on damages, a jury was denied although demanded, the default was entered solely as a result of the attorney's failure to appear for trial, and the notice of default was withheld by the opposing party); *Sonus Corp. v. Matsushita Electric Industrial Co., Ltd.,* 61 F.R.D. 644 (D.Mass.1974) (holding that a default judgment was void where there was no notice of a motion for an order to direct the plaintiff to

answer interrogatories and requests for admission, there was no notice of the application for a default based on the plaintiffs failure to comply with the order, and there was no notice of the entry of the default judgment).

16. Trehan had been unable to enforce the judgment in the United States because Von Tarkanyi had no assets in this country and Unigulf had ceased doing business in the United States in November 1981.

Ordered that pending final disposition of the matters remanded hereby to the Bankruptcy Court for its consideration initially, the plaintiffs and their attorneys and agents are enjoined forthwith from levying, executing on or attempting to enforce or effect collection, in this or any other jurisdiction, of the said judgment of the Bankruptcy Court in favor of plaintiffs and against defendant, in the amount of $450,-000 entered in the Bankruptcy Court, dated August 30, 1982; and all proceedings on and the effectiveness of said judgment are in all respects stayed until further order of this Court.

See also Bkrtcy., 32 B.R. 504; Bkrtcy., 30 B.R. 779; and D.C., 18 B.R. 698.

So Ordered.