**WALTER E. HELLER & COMPANY, Inc., Plaintiff-Appellee,**

v.

**AMERICAN FLYERS AIRLINE CORPORATION, Defendant-Appellant.**

**WALTER E. HELLER & COMPANY, Inc., Plaintiff-Appellee,**

v.

**Virginia PIGMAN as Executrix of the Estate of Reed Pigman, Deceased, Defendant-Appellant.**

**No. 64, Docket 71–1164.**

United States Court of Appeals, Second Circuit.

Argued Oct. 4, 1971.

Decided April 5, 1972.

Herbert M. Wachtell, Theodore Gewertz, Wachtell, Lipton, Rosen & Katz, New York City, for plaintiff-appellee.

Gerald E. Bodell, Watters & Donovan, New York City, for defendants-appellants.

Before MURRAH,* WATERMAN and SMITH, Circuit Judges.

* Senior Circuit Judge for the Tenth Circuit, sitting by designation.

WATERMAN, Circuit Judge:

In order to finance a contemplated purchase of a Boeing 707 jet aircraft from the Boeing Company, the American Flyers Airline Corporation (American) on March 23, 1966 contracted to borrow a sum of money not to exceed $8,900,000 from Walter E. Heller & Company (Heller). Subsequent to the signing of the contract several events occurred which prevented the parties from consummating their agreement, and, after a conference on June 28, 1966, Heller on June 30 commenced its action on contract against American seeking to recover $267,500. This sum represented an item of $250,000 the contract provided was to be paid to Heller as "liquidated damages and not a penalty" if, Heller not being at fault, the financing should not be consummated; $7,500, the unpaid balance upon a $40,000 commitment fee; and an allowance of $10,000 for reimbursable costs incurred by Heller in connection with the contract. When the contract was entered into, one Reed Pigman owned 98% of the corporate stock of American and was its President and Chief Executive Officer. Contemporaneously with the corporation's contract Pigman delivered to Heller a personal written guaranty of payment of American's indebtedness up to a maximum of $500,000. On April 22, 1966, Pigman was killed in an airplane crash, and on July 6, 1966 Heller brought its action on the contract of guaranty against Virginia Pigman as Executrix of the Estate of Reed Pigman, deceased. Jurisdiction in the United States District Court for the Southern District of New York is based upon diversity of citizenship, and the two actions were consolidated in the district court and tried there as a single action before Judge Gus J. Solomon of the District of Oregon,[1] sitting without jury.

Findings of Fact and Conclusions of Law were filed on October 20, 1970 and judgment was entered against both de-fendants, American and Virginia Pigman as Executrix, for $257,500, being recoveries of $250,000 for liquidated damages, and of $7,500, the unpaid balance of the commitment fee.

This judgment is attacked by both defendants from two approaches. First, they contend that the liquidated damages clause is, in reality, a clause providing for a penalty and, as such, is not enforceable. Second, they argue that inasmuch as the performance of American's contract depended upon the continued activity in his corporation of Reed Pigman, the deceased president and major stockholder of American, his death in a tragic air accident on April 22, 1966 put an end to any liability of the corporation and the guarantor under the two contracts. Finally, the Estate of Reed Pigman argues that the contract of guaranty did not contemplate a guaranty to pay damages that might be recoverable for breaches arising under the loan agreement, and that the judgment against the Estate should be reversed. We find little merit in any of these claims and affirm the judgment below.

■ Appellants advance a number of arguments in support of their position that the liquidated damages clause of the contract should not be enforced. None of these reasons are convincing. The main thrust behind the contentions seems to be that the sum of $250,000 "bears no relation to the actual loss which Heller might or did sustain." However, we observe that under New York law,[2] contrary to the assumption of the defendants, the actual damages suffered by the party for whose benefit the clause is inserted in the contract have little relevance to the validity of a liquidated damages clause. The soundness of such a clause is tested in light of the circumstances existing as of the time that the agreement is entered into rather than at the time that the damages are incurred or become payable. Dunn v.

1. Judge Solomon, now a Senior district judge, was then sitting in the Southern District of New York by designation.

2. The contract expressly provides that New York law was to govern its interpretation.

Morgenthau, 73 App.Div. 147, 76 N.Y.S. 827, 828 (1st Dep't 1902); Seidlitz v. Auerbach, 230 N.Y. 167, 172, 129 N.E. 461 (1920); Harbor Island Spa, Inc. v. Norwegian America Line A/S, 314 F. Supp. 471, 474 (SDNY 1970). It thus makes no difference whether the actual damages are ultimately higher or lower than the sum stated in the clause, see, i. e., Harbor Island Spa, Inc. v. Norwegian America Line A/S, *supra*. It is also clear that under New York law a contractually agreed upon sum for liquidated damages will be sustained where (1) actual damages may be difficult to determine and (2) the sum stipulated is not "plainly disproportionate" to the possible loss. Mosler Safe Co. v. Maiden Lane Safe Deposit Co., 199 N.Y. 479, 485, 93 N.E. 81 (1910); Konner Rental Corp. v. Pedone, 50 Misc.2d 69, 269 N.Y. S.2d 463, 465 (Sup.Ct.1966); Harbor Island Spa, Inc. v. Norwegian America Line A/S, *supra*. Here the nature of the transaction and the amount of money involved in it convince us that an agreement for liquidated damages was appropriate in this situation and that the sum agreed upon by the parties was not unreasonable. Appellants point to the expenses they say were incurred by, or accrued to, Heller in connection with its dealings with American and thereby seek to indicate that the stipulated sum was not only plainly or grossly disproportionate to damages actually suffered but also was plainly or grossly disproportionate to any damages that could have been contemplated at the time the contract was entered into. They would have us entirely overlook most of the el-

ements of damages listed by the court below in its Findings of Fact set forth in the margin,[3] and Conclusions of Law. First, Heller was faced with the loss of some or all of the interest to which it was entitled under the contract, which would have been over the full term of the loan nearly $3,000,000, and even if the debtor should avail itself of the earliest permitted prepayment of principal Heller would still have been entitled to about $1,000,000 of interest. Also, even though Heller may not have "set aside any funds" it was, as of the signing of the contract, contractually limiting its lending activities so that the funds to be advanced to American might be available when needed by American. As was observed by the court below, if the American transaction was not consummated the lender was faced with "the cost and expense of procuring substitute borrower or borrowers and the attendant delay in lending the sums to be lent to American Flyers." Thus, when these factors are considered together with the fact that the sum arrived at was the product of an arms-length transaction between sophisticated businessmen, ably represented by counsel, the sum stated for liquidated damages does not seem to be a sum plainly disproportionate to the possible loss.

Moreover, Heller's conceivable losses were not subject to easy calculation. The variables inherent in a lender-borrower relationship arising out of the borrower's need for funds to purchase a nine million dollar jet airplane are numerous and uncertain. Such facts as rate of return, duration of the loan, risk,

---

3. The court found as a fact that:

   31. Among the elements of the prospective damages which were considered by the parties in fixing the sum of $250,000 as liquidated damages were the following:

   (a) The loss of interest income to plaintiff upon the amount of the purchase price to be loaned;

   (b) The necessity of plaintiff having to restrict its lending activities so as to make the funds required for the loan available notwithstanding the then existing "tight" money market;

   (c) The cost and expense of procuring substitute borrower or borrowers and the attendant delay in lending the sums to be lent to American Flyers;

   (d) the impossibility of comparing the security, risk and return on such "substitute" loans with that contracted for with American Flyers; and

   (e) the time, effort and expense of plaintiff's executives and employees in investigating, negotiating and approving the transaction and in working with its special counsel in the preparation of documents.

extent and realizability of collateral, and the other obvious uncertainties inherent in this particular contract combined to make it difficult to foresee, at the time the contract was executed, the extent of damages which might arise from the breach of the loan agreement. There-fore, it was reasonable that a sum for liquidated damages should be agreed to after arms-length negotiations.

■ Appellant also contends that the stipulated commitment fee of $40,000 and not the stipulated sum of $250,000 is the true measure of Heller's damages. Appellant acknowledges, however, as it must, that "[t]he sum was payable whether or not the loan was made." This fact, together with the wording of the contract, make it clear that the sum was not intended to serve as damages. Moreover, it appears from uncontradicted testimony that the commitment fee was a standard fee that most lenders charge for long term commitments on money.

■ Appellants make one final challenge to the liquidated damages clause on the ground that the loan agreement provides in Section 9(c) that "[t]he rights and remedies herein provided or referred to are cumulative and not exclusive of any rights or remedies provided for by law, or in the Note, the Mortgage, or any other agreement or instrument." They reason that this clause reserves the lender's right to sue for actual damages, and, this being so, the liquidated damages clause would be an attempt to stipulate a minimum recovery, a stipulation which, under New York law, is invalid, see, i. e., Jarro Building Industries Corp. v. Schwartz, 54 Misc.2d 13, 281 N.Y.S.2d 420 (App.Term 2d Dep't 1967).

This contention is belied by a simple reading of the contract. The contract specifically states (Section 8, entitled: Costs and Expenses and Damages):

American and Heller agree that it would be difficult, if not impossible, to accurately assess the damages suffered by Heller as the result of the failure of the transactions to close under the circumstances specified above and accordingly they do hereby agree that the aforesaid sum [$250,000] represents reasonable and fair recompense to Heller for all of the loss, damage and expense, liquidated and unliquidated, which Heller may suffer . . . .

A fair reading of the instrument as a whole shows that the boilerplate language American points out as language which avoids the clause specifying liquidated damages refers to those legal remedies which the lender could seek in the event of default after the loan was made. This language is found with other generalized language in the final section, "Miscellaneous," of the instrument in contrast to the specific language contained in Section 8 of the Contract where the liquidated damages clause is found.

■ The appellants' second attack on the judgment is based upon the oft-stated principle of contracts that "when performance depends on the continued existence of a given person or thing, and such continued existence was assumed as the basis of the agreement, the death of the person or the destruction of the thing puts an end to the obligation." Lorillard v. Clyde, 142 N.Y. 456, 462, 37 N.E. 489, 491 (1894); Restatement of the Law of Contracts, Section 459 (St. Paul, Minn, A.L.I.Publ.1932).

■ Appellants contend that the parties contracted in the mutual belief that Mr. Pigman was essential to the performance of the contract and that his death "put an end to the contract." American points to the following in support of the contention:

Reed Pigman, at the time that the contract was entered into, was the owner of 98% of the stock of American and was its president and chief executive officer. It is clear from the testimony of the plaintiff that a good deal of Heller's willingness to go along with the transaction was the history of the company under Reed Pigman's

management. In the contract Heller's people made it clear that they expected him to stay on as American's president. It is stated in Section 2(m) of the contract that Heller was to be relieved of its obligation to loan the money if Reed Pigman should cease to be the president and chief executive officer of American. Finally, it is pointed out that the death of Reed Pigman was stated in the complaint as being one of Heller's excuses for non-performance, and it is listed by the trial judge as such in his Findings of Fact and Conclusions of Law.

However, the doctrine invoked by the defendants is not applicable here. Its primary application is in the area of contracts for personal service. Here, indeed, Reed Pigman was very important to Heller but his continued activity in his corporation was not essential to the continued existence of the contract. Heller did indeed insist upon Mr. Pigman's continuance as American's president and inserted a clause into the contract making such continuance a condition precedent to its obligation. However, it is hornbook law that a condition precedent in favor of one of the parties may be waived by that party. See, *i. e.*, Langley v. Rouss, 185 N.Y. 201, 207, 77 N.E. 1168, 1171 (1906); Oleg Cassini, Inc. v. Couture Coordinates, Inc., 297 F.Supp. 821, 830 (SDNY 1969); Arrow Plumbing Co., Inc. v. Dare Construction Corp., 212 N. Y.S.2d 438 (Sup.Ct. Nassau County 1961). The actions of the parties subsequent to the death of Reed Pigman make plain that (1) Reed Pigman was not essential to the performance of the contract, and (2) Heller waived the condition in question.

The evidence shows that neither party considered the contract to be at an end. American continued to make payments against the commitment fee. Prior to the meeting on June 28, 1966, it came to Heller's attention that American was not fulfilling its contractual obligations in a number of ways, and at this June 28 meeting breaches by American of a much more serious nature were disclosed. Indeed, to quote from the brief for the appellee, "American Flyers . . . had been conducting itself with total disregard of the affirmative and negative covenants that the Contract expressly imposed," and the court so found.[4] Upon discovery of these breach-

---

4. Judge Solomon made the following findings:

6. American Flyers breached the Contract in the following respects:

On or about June 14, 1966, without the consent of plaintiff, American Flyers purchased an Electra aircraft for $1,425,000 and in connection therewith incurred indebtedness and placed a conditional sales lien upon said aircraft of $1,000,000 in violation of Sections 4(a), (b) and 2(e) of the Contract leaving itself with only a $425,000 equity in new aircraft as contrasted with approximately $1,072,000 in equity in the crashed plane which had been required by Section 1(c) of the Contract to be pledged to plaintiff as collateral.

(b) In or about June 1966, without the consent of plaintiff and in violation of Sections 4(b) and 2(e) of the Contract, American Flyers entered into an agreement with Lucian J. Hunt whereby it incurred an obligation to Mr. Hunt in excess of $25,000, to wit, $50,000 per annum.

(c) During the months of April, May and June, 1966, American Flyers failed to furnish plaintiff with copies of first-quarter financial statements, a non-default statement and statements and reports which were filed with governmental agencies, in violation of Section 5(b) of the Contract, and further failed to notify plaintiff of the commencement of major lawsuits in amounts in excess of $10,000 each arising out of the crash and of proceedings and investigations commenced and actions taken by the Civil Aeronautics Board, the Federal Aviation Agency and the Department of Defense, which proceedings, investigations and actions materially affected and involved American Flyers' operating licenses and certificates, in violation of Sections 2(e), 3(g), 3(k) and 5(f) (i) and (ii) of the Contract.

7. American Flyers rendered itself and became unable to fulfill material conditions precedent to plaintiff's obligation to proceed with the transaction contemplated by the Contract by reason of the events set forth below:

(a) On April 22, 1966, Reed Pigman was killed in the crash of an Electra aircraft owned and operated by American Flyers and ceased to be President

es, Heller terminated the contract and instituted these proceedings. Thus, the contract could have remained in full force if it had not been for the breaches by American. Therefore, it cannot be said that the continued activity of Mr. Pigman in American's affairs was essential to the continuation of the contract relationship between Heller and American, or that Pigman's death terminated that contract.

█ Finally, Pigman's executrix raises questions as to the scope of Reed Pigman's guaranty of American's indebtedness under the loan agreement. For the first time she asserts in this court that the guaranty should not be read so as to include a liability for the agreed-upon sum for liquidated damages. We decline to reach this question. A search of the record does not reveal that the scope of the guaranty was placed in issue below, and its scope was not considered by the district court. A court of appeals is not the proper forum for raising new issues such as this, nor is an appellant normally permitted to have the benefit of a new theory on appeal. See, *i. e.*, National Equipment Rental, Limited v. Stanley, 283 F.2d 600, 602 (2 Cir. 1960) ; Roto-Lith, Limited v. F. P. Bartlett & Co., 297 F.2d 497, 500 (1 Cir. 1962). Moreover, even though in some circumstances we may interpret a written instrument which has not been interpreted by the trial court, here we are directed to no special circumstances which would warrant us in so doing.

We affirm the judgment below.

and Chief Executive Officer of American Flyers as required by Section 2(m) of the Contract;

(b) In and about April, May and June of 1966, suits were commenced against American Flyers and proceedings and investigations commenced by the Civil Aeronautics Board, the Federal Aviation Agency and other governmental agencies and departments, which separately and in the aggregate may at the time have resulted in material adverse change in the business, prospects, affairs, operations, assets and condition of American Flyers in violation of Section 2(e) and 3(g) of the Contract;

(c) In May, 1966, American Flyers' contracts for the carrying of military passengers were suspended by a governmental agency or department as a result of the aforesaid crash of April 22, 1966 of American Flyers' Electra aircraft, which suspension was an event of default under the proposed mortgage of American Flyers' fleet of aircraft and thereby placed American Flyers in violation of Section 2(e) of the Contract;

(d) In and about April, May and June of 1966, proceedings were pending or threatened as the result of the aforementioned crash and facts as to American Flyers' operations revealed in the investigation thereof, which proceedings at the time may have resulted in the alteration, amendment, modification, suspension or revocation of American Flyers' air carrier operating certificate is-

sued by the Federal Aviation Agency and American Flyers' certificates of public convenience and necessity issued by the Civil Aeronautics Board in violation of Section 3(k) and 2(e) of the Contract;

(e) During the months of April, May and June of 1966, as a result of the aforementioned crash, the large number of fatalities caused thereby, including that of American Flyers' President and Chief Executive Officer, the facts as to American Flyers' operations revealed in the investigation thereof, the suspension of American Flyers' military contracts, the lawsuits commenced and threatened against American Flyers, the investigations and proceedings commenced and threatened, and the future regulatory problems with the Civil Aeronautics Board, the Federal Aviation Agency and other governmental agencies and departments faced by American Flyers as a result of the aforesaid crash and the facts as to American Flyers' operations revealed in the investigations thereof, there was material adverse change in the business, prospects, affairs, operations, assets and conditions of American Flyers and said Reed Pigman after the date of the most recent prior financial statements that had been furnished to plaintiff with respect to American Flyers and said Reed Pigman in violation of Section 2(e) of the Contract.