### In re VANDERVEER ESTATES HOLDINGS, INC., Debtor.

No. 01–20348–608.

United States Bankruptcy Court, E.D. New York.

Aug. 7, 2002.

Abraham J. Backenroth, Backenroth, Frankel & Krinsky, LLP, New York City, for Debtor.

Andrew C. Gold, Herrick, Feinstein, LLP, New York City, for VE Apartments LLC.

## DECISION AND ORDER

CARLA E. CRAIG, Bankruptcy Judge.

This matter comes before the Court on the debtor's objection to the claim of VE Apartments LLC ("VE"), holder of a first mortgage on the debtor's principal asset, an apartment complex located in Brooklyn, New York (the "Property"). The debtor objects to VE's claim insofar as it includes a yield maintenance premium and default interest, and seeks a determination that, for the purposes of the treatment of VE's claim under debtor's Third Amended Plan of Reorganization ("Plan"), such amounts are disallowed. The questions presented on this motion are whether the yield maintenance premium provided under VE's loan documents is enforceable under New York law, and allowable under 11 U.S.C. § 506(b) of the Bankruptcy Code, whether the yield maintenance premium is properly included in VE's claim for the purposes of the Plan, and whether the default interest provided under VE's loan documents is properly included in its claim under § 506(b) for the purposes of the Plan.

### Jurisdiction

This Court has jurisdiction over this core proceeding under 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (B), (L) and (O) and the Eastern District of New York standing order of reference dated August 28, 1986. This Memorandum Decision constitutes the Court's findings of fact and

conclusions of law to the extent required by Fed. R. Bankr.P. 7052.

### Facts

The facts relevant to this motion are not in dispute, except as otherwise indicated.

VE holds a first priority mortgage lien on the Property (the "Mortgage"), securing an obligation of the debtor to VE which VE asserts is in excess of $75,000,000 (the "Note"). Pursuant to the terms of the Mortgage, VE also holds an assignment of leases and rents of the Property.

The Note contains a provision requiring the payment of a Yield Maintenance Premium in connection with any prepayment of the loan, "whether the prepayment is voluntary or involuntary (in connection with holder hereof's acceleration of the unpaid principal balance of this Note) or the Instrument is satisfied or released by foreclosure (whether by power of sale or judicial proceeding), deed in lieu of foreclosure or by any other means." The Note, including the full text of the provision of the Note relating to the Yield Maintenance Premium, is annexed as Exhibit 5 to VE's Response to the instant motion.

The Note also provides that in the event any payment due under the Note remains past due for 10 days or more, the rate of interest payable on the principal balance of the Note shall increase from 7.56% to 12.56% per annum. The debtor defaulted under the Note and Mortgage, and the loan was accelerated by letter dated June 4, 2001. In that letter, among other things, VE demanded payment of the Yield Maintenance Premium in the amount of $8,194,379.24, and payment of interest at the 12.56% default rate on the principal balance from the date of acceleration.

The debtor commenced this chapter 11 case on August 8, 2001. In the version of the Plan that is currently before the Court, debtor proposes to treat VE's claim as fully secured, and to pay it over the remaining term of the Note, which is approximately a five-year period, with interest at the rate of 7.56% (the non-default rate under the VE Note), pursuant to § 1129(b)(2). Under the Plan, unsecured creditors will be paid in full on confirmation, with interest, and are treated as unimpaired. Although the debtor is maintaining the original term and interest rate of the Note under this Plan, the debtor is not curing and reinstating the VE loan so as to render VE unimpaired under § 1124. VE's rights are modified under the Plan in a number of material respects, including the capitalization of millions of dollars of interest arrears. The debtor contends that VE's claim under the Plan may not include either the Yield Maintenance Premium or default interest.

### Discussion

*Is VE's Right to Receive the Yield Maintenance Premium Triggered, Where the Debtor's Plan Does Not Propose Prepayment?*

The debtor contends that, under the terms of the Note, the Yield Maintenance Premium is due only upon a prepayment. Because the debtor will not prepay the Note under the Plan, the debtor argues, no Yield Maintenance Premium is due. In making this argument, the debtor relies upon the following language of the Note:

> [T]his Note may only be prepaid ... upon not less than forty five (45) days and not more than ninety (90) days prior written notice by the undersigned to the holder hereof and the simultaneous payment by the undersigned to the holder hereof by an amount (the "Yield Maintenance Premium").....

The debtor further argues that, although the Yield Rate (which is employed in de-

termining the Yield Maintenance Premium) is calculated, in the case of an involuntary prepayment, by reference to the yield on a U.S. Treasury Security of comparable maturity five days prior to *acceleration,* this does not mean that the right to receive the Yield Maintenance Premium accrues upon acceleration—that this is simply a reference point for fixing the Yield Rate.

VE argues that under the language of the Note, VE's right to the Yield Maintenance Premium accrues upon acceleration, although the Yield Maintenance Premium will not be collected until payment is received. Since under § 101(5) of the Bankruptcy Code, "claim" is broadly defined to include any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," VE argues, the Yield Maintenance Premium is properly included in its claim.

 It is not necessary to determine whether VE's right to receive the Yield Maintenance Premium arises upon acceleration or prepayment, however, because the debtor's treatment of VE under the Plan must comply with § 1129(a)(7) of the Bankruptcy Code. Section 1129(a)(7) provides that a plan or reorganization cannot be confirmed unless

[w]ith respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . .

Even if the debtor's interpretation of the Note is correct, it is clear that if the debtor were liquidated under chapter 7 (which would result in the payment of VE's secured claim), VE's right to receive the Yield Maintenance Premium would be triggered under the terms of the Note. Accordingly, VE's claim, under the Plan, must include an amount equal to the Yield Maintenance Premium that it would be entitled to receive upon liquidation, provided that (1) the Yield Maintenance Premium is an enforceable provision of the Note under New York law, and (2) the Yield Maintenance Premium is allowable under § 506(b) of the Bankruptcy Code.

The debtor argues, in a letter submitted after the hearing on this motion, that liquidation of the debtor under chapter 7 would not necessarily result in a prepayment of VE's secured claim, and that therefore § 1129(a)(7) does not require that VE's claim under the Plan include an amount equal to the Yield Maintenance Premium. Examples proffered by the debtor of liquidation scenarios that would not trigger VE's entitlement to the Yield Maintenance Premium are: (1) sale of the Property subject to the VE Note and Mortgage; (2) sale of the Property subject to a new note and mortgage that maintains VE's yield; or (3) abandonment of the Property.

The debtor's assertion is simply wrong. There is no scenario proffered by the debtor in which liquidation of the debtor under chapter 7 would not trigger the payment of the Yield Maintenance Premium. Let us consider each of the examples offered by the debtor in turn.

The debtor asserts that a chapter 7 trustee could sell the Property "subject to" VE's note and mortgage, without triggering the Yield Maintenance Premium. This is not true, either legally or practically.

**128**

Under § 363(k) of the Bankruptcy Code, at any sale by the trustee of property of the estate that is subject to a lien that secures an allowed claim, the holder of the claim may bid and may offset the claim against the purchase price of the property, unless the court for cause orders otherwise. Therefore, if this case were converted to chapter 7, and the chapter 7 trustee proposed to sell the Property "subject to" VE's note and mortgage, VE would be entitled to credit bid its claim to buy the Property (unless the court for cause ordered otherwise, and the debtor has not proffered any fact that would constitute cause to deny VE the right to credit bid). Since, in the scenario proposed, the Property is being sold subject to VE's note and mortgage, VE would obviously be in a position to outbid any purchaser of the Property. If VE bid in its claim and bought the Property, the note and mortgage would be satisfied by offset of the credit bid. In such event, the Yield Maintenance Premium would be triggered, under the language of the Note that provides for payment of the Yield Maintenance Premium "whether the prepayment is voluntary or involuntary . . . or the Instrument is satisfied or released by foreclosure . . ., deed in lieu of foreclosure or by any other means."

Next, the debtor asserts that a chapter 7 trustee could sell the Property subject to a new note and mortgage that maintains VE's yield. This is patently incorrect. There is no provision in the Bankruptcy Code that would permit a chapter 7 trustee to modify a secured creditor's note and mortgage, or to impose a new note and mortgage on the secured creditor (whether or not the secured creditor's yield is maintained). Modification of a secured creditor's rights can take place pursuant to a confirmed chapter 11 reorganization plan, but not under chapter 7. Furthermore, if the Property were somehow sold "subject to" a new note and mortgage, the secured creditor would be entitled under § 363(k) to credit bid that secured claim, which would trigger the Yield Maintenance Premium for the reasons outlined above.

Finally, the debtor argues that the chapter 7 trustee could abandon the Property, pursuant to § 554 of the Bankruptcy Code. Of course, this scenario would not actually occur, at least under the factual assumptions which are the basis for the Plan (which is the context in which the Plan's compliance with § 1129(a)(7) must be evaluated) because the Plan assumes that there is significant equity in the Property, and abandonment is permitted only where the property is "burdensome to the estate or . . . of inconsequential value and benefit to the estate." 11 U.S.C. § 554. Contrary to the debtor's assertion, however, this scenario, too (if it were to occur) would trigger VE's right to recover the Yield Maintenance Premium. If the Property were abandoned, it would no longer be property of the estate. VE would be free to pursue its foreclosure of the Property. The Note (as quoted above) expressly provides that the Yield Maintenance Premium is payable in the event of foreclosure.

In short, the debtor's arguments that § 1129(a)(7) of the Bankruptcy Code does not require the debtor to include the Yield Maintenance Premium in VE's claim under the Plan have no merit.

*Is the Provision of the Note Requiring Payment of the Yield Maintenance Premium Enforceable Under New York Law?*

VE contends that yield maintenance provisions are enforceable under New York law as liquidated damages. This contention is supported by Second Circuit authority. In *United Merchants and Mfr., Inc. v. Equitable Life Assurance Soc'y of the United States (In re United Merchants and Mfr., Inc.)*, 674 F.2d 134 (2d Cir.1982),

the court was called upon to consider the enforceability under New York law of a term of a loan agreement that provided upon default, the lender would be entitled to receive (in addition to principal and interest) " 'an amount equal to the pre-payment charge that would be payable if [the borrower] were pre-paying such Note at the time'." *Id.* at 140. The debtor argued, and the bankruptcy court ruled, that this provision was unenforceable under New York law because it imposed a penalty rather than true liquidated damages. *Id.*

■ The Second Circuit reversed, applying *Walter E. Heller & Co. v. American Flyers Airline Corp.,* 459 F.2d 896 (2d Cir.1972). As the *Heller* court held,

> (U)nder New York law a contractually agreed upon sum for liquidated damages will be sustained where (1) actual damages may be difficult to determine and (2) the sum stipulated is not "plainly disproportionate" to the possible loss.

*United Merchants,* 674 F.2d at 142 (*citing Heller,* 459 F.2d at 899).

First, the court found that the bankruptcy court "erred by using hindsight," and by requiring a showing of actual loss, in determining whether the *Heller* test had been met. *United Merchants,* 674 F.2d at 142. Again quoting *Heller,* the court observed that

> (U)nder New York law ... the actual damages suffered by the party for whose benefit the clause is inserted in the contract have little relevance to the validity of a liquidated damages clause. The soundness of such a clause is tested in light of the circumstances existing as of the time that the agreement is entered into rather than at the time that the damages are incurred or become payable .... It thus makes no difference whether the actual damages are

ultimately higher or lower than the sum stated in the clause ....

*United Merchants,* 674 F.2d at 142 (*citing Heller,* 459 F.2d at 898–99).

Next, the court examined the factors considered by the *Heller* court in determining whether the liquidated damages clause before it was enforceable under New York law. Those factors, as described by the *Heller* court, are the following:

> First, Heller (the lender) was faced with the loss of some or all of the interest to which it was entitled under the contract .... Also, even though Heller may not have "set aside any funds" it was, as of the signing of the contract, contractually limiting its lending activities so that the funds to be advanced to American (the borrower) might be available when needed by American. As was observed by the court below, if the American transaction was not consummated the lender was faced with "the cost and expense of procuring substitute borrower or borrowers and the attendant delay in lending the sums to be lent to American Flyers." Thus, when these factors are considered together with the fact that the sum arrived at was the product of an arms-length transaction between sophisticated businessmen, ably represented by counsel, the sum stated for liquidated damages does not seem to be a sum plainly disproportionate to the possible loss.

> Moreover, Heller's conceivable losses were not subject to easy calculation. The variables inherent in a lender-borrower relationship arising out of the borrower's need for funds to purchase a nine million dollar jet airplane are numerous and uncertain. Such facts as rate of return, duration of the loan, risk, extent and realizability of collateral, and the other obvious uncertainties inherent

in this particular contract combined to make it difficult to foresee, at the time the contract was executed, the extent of damages which might arise from the breach of the loan agreement. Therefore, it was reasonable that a sum for liquidated damages should be agreed to after arms-length negotiations.

*United Merchants,* 674 F.2d at 142–143 (*citing Heller,* 459 F.2d at 899–900).

Finally, The *United Merchants* court concluded that

[e]specially in the light of Heller, it is apparent that the potential damages from breach of the loan agreements in this case were difficult to determine. Moreover, it is apparent that the amount stipulated was not "plainly disproportionate to the possible loss." Therefore, we hold that the liquidated damages provisions in the loan agreements in this case are valid under New York law.

*United Merchants,* 674 F.2d at 143.

■■■ This conclusion applies with equal validity in this case. Potential losses from prepayment of a large fixed-rate, long-term mortgage are "not subject to easy calculation." *Id.* As the *Heller* court observed, factors that render the determination of potential damages difficult include the loss of interest to the lender, the rate of return on any substitute loan or loans, the duration of that loan (or those loans), the risk of the substitute loan or loans, and the extent and realizability of the collateral for the substitute loan or loans. Furthermore, the Yield Maintenance Premium is not "plainly disproportionate to the possible loss." *Id.* It is calculated based on prevailing Treasury Bond yields at or about the time of prepayment, and is structured to permit the lender, in the event of prepayment, to receive its bargained for yield while reinvesting the prepaid funds in U.S. Treasury instruments. The yield maintenance provision at issue does not result in an automatic premium to the lender in the event of prepayment. If interest rates had risen after the loan was made, such that Treasury yields equaled or exceeded the 7.56% interest rate payable under the VE Note, the premium called for under the calculations would be zero. Moreover, this provision was the product of arm's-length negotiations between sophisticated parties represented by counsel. In short, all of the factors considered by the courts in *Heller* and *United Merchants* weigh in favor of finding that the Yield Maintenance Premium provision is an enforceable liquidated damages clause under New York law.

The debtor argues that these Second Circuit authorities have no relevance to this case because the yield maintenance provision is not a liquidated damages clause. This argument is based upon the following language of the Note:

The Yield Maintenance Premium is not a penalty or additional interest, but is holder hereof's cost of liquidating its investments in the event of any prepayment of this Note.

VE Apartments LLC Note, annexed as Doc. 206, Ex. 5 at 2.

The debtor's argument in this regard is twofold. First, the debtor seems to be arguing that under the terms of the Note quoted above, VE agreed to limit any Yield Maintenance Premium to its actual costs. This argument simply cannot be reconciled with the language of the Note. If the parties intended that VE should recover only its actual costs in the event of prepayment, they could easily have so provided. Instead, the parties set forth a detailed formula for the calculation of the Yield Maintenance Premium. Debtor's argument makes this provision entirely meaningless. Agreements should not be interpreted in a

way that renders any of the provisions superfluous or meaningless. *Sayers v. Rochester Telephone Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993) (contract clauses must be read in the context of the entire agreement to safeguard against adopting an interpretation that would render any individual provision superfluous).

Second, the debtor seems to argue that the yield maintenance provision is an impermissible attempt to fix in advance the costs recoverable by VE on prepayment. This argument is predicated upon a narrow reading of the term "costs" to mean out-of-pocket costs incurred by the lender upon prepayment. A full reading of the clause makes it very clear that this was not the parties' intent, but that the parties intended rather to provide a formula for calculation of the losses recoverable by the lender from the borrower in the event of prepayment. As the Second Circuit noted in *Heller* and *United Merchants,* the "conceivable losses"—*i.e.,* costs—that might be incurred by a lender upon prepayment are "not subject to easy calculation," and are not limited to out-of-pocket costs. This Court sees no reason in the language of the Note or in the relevant authority to interpret "costs" so narrowly. Indeed, other provisions of the Note entitle the lender to recover various out-of-pocket costs upon breach, so that the interpretation urged by the debtor would render this provision, again, superfluous.

For the reasons set forth above, this Court finds that the yield maintenance provision is an enforceable liquidated damages clause under New York law.

*Is the Yield Maintenance Premium Allowable Under § 506(b) of the Bankruptcy Code?*

Section 506(b) of the Bankruptcy Code provides as follows:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest, on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

Thus, § 506(b) permits a secured creditor to recover post-petition interest, and reasonable post-petition fees, costs, or charges provided for under the relevant agreement, to the extent of the value of the collateral securing the claim. Interest, fees, costs and charges arising pre-petition are part of the secured creditor's claim in the first instance, and are therefore not governed by § 506(b). See *4 Collier on Bankruptcy,* ¶ 506.04[1] at 506–101, 506–102 (15th ed. rev.2002) ("The amount of a creditor's 'claim' is typically determined as of the petition date, and includes the principal amount of the obligation plus all matured *pre* petition interest, fees, costs and charges owing as of the petition date. The allowability of these prepetition amounts as part of the secured creditor's 'claim' is not determined by section 506, but is governed by section 502 in conjunction with other provisions of the Code"). Thus, if VE is correct, and its claim for the Yield Maintenance Premium arose upon acceleration (a pre-petition event), the allowability of the Yield Maintenance Premium is not governed by § 506(b), but by § 502. The debtor has cited no provision of § 502 nor any other provision of the Bankruptcy Code that would limit VE's right to include the Yield Maintenance Premium, as a prepetition charge, in its claim.

However, if the Yield Maintenance Premium must be allowable under § 506(b) in order to be included in VE's claim under the Plan, it satisfies that requirement.

The debtor argues that the Yield Maintenance Premium is not a "reasonable fee[ ], cost[ ], or charge[ ]," and therefore must be disallowed. In support of this argument, the debtor cites several cases which hold that prepayment charges are inherently unreasonable unless they effectively measure actual damages. Actual damages, according to these courts, must be "measured by the difference between the market rate of interest at the time of prepayment and the contract rate for the duration of the loan, discounted to present value." *In re Schwegmann Giant Supermarkets Partnership*, 264 B.R. 823, 828 (Bankr.E.D.La.2001); *accord, In re Outdoor Sports Headquarters, Inc.*, 161 B.R. 414 (Bankr.S.D.Ohio 1993) (finding the charges reasonable); *Imperial Coronado Partners, Ltd. v. Home Fed. Sav. and Loan Ass'n (In re Imperial Coronado Partners, Ltd.)*, 96 B.R. 997 (9th Cir. BAP 1989) (remanding for evidentiary hearing regarding the market rate at the time of prepayment); *In re A.J. Lane & Co., Inc.*, 113 B.R. 821, 829 (Bankr.D.Mass.1990) (finding prepayment penalty equal to percentage of loan balance unreasonable, because it presumes a loss); *In re Duralite Truck Body & Container Corp.*, 153 B.R. 708 (Bankr.D.Md.1993) (same); *In re Kroh Brothers Dev. Co.*, 88 B.R. 997 (Bankr. W.D.Mo.1988) (prepayment premium unreasonable which did not provide for appropriate adjustment based on interest rate fluctuation or discount the lost interest to present value); *In re Skyler Ridge*, 80 B.R. 500 (Bankr.C.D.Cal.1987) (same).

Here, unlike in *A.J. Lane* and *Duralite*, the Yield Maintenance Premium formula does not presume a loss, such as by charging the debtor a fixed percentage of the unpaid principal balance of the loan (which would be payable even if interest rates went up after the loan was made). Instead, it is calculated by subtracting the yield on a Treasury Note of comparable maturity from the note interest rate, applying the difference to the remaining principal balance at the time of prepayment, and discounting that amount to present value. Thus, it is an attempt to compensate the lender for the actual yield loss incurred upon prepayment. The features found unreasonable by courts disallowing pre-payment penalties, such as a formula (*e.g.,* a fixed percentage of the loan balance) that presumes damages regardless of any change in interest rates, or failure to discount the lost interest to present value, are not present here. Indeed, the debtor's only quarrel with the formula is that it measures lost interest based upon the difference between the original mortgage rate and the current yield on a Treasury Bill of comparable maturity, rather than the difference between the original mortgage rate and the current market mortgage rate.

This objection presumes that the lender will be able immediately to invest the prepaid monies in a loan of comparable risk, size and maturity. However, the parties, in negotiating the loan agreement, chose not to make this assumption. Instead, they fixed the Yield Maintenance Premium at an amount that would permit the lender to maintain its yield if the prepaid funds were reinvested in a Treasury Bill of comparable maturity. This choice of a Treasury Bill benchmark is not inherently unreasonable. As the *Heller* court observed,

> The variables inherent in a lender-borrower relationship ... are numerous and uncertain. Such facts as rate of return, duration of the loan, risk, extent and realizability of collateral, and the other obvious uncertainties inherent in this particular contract combined to make it difficult to foresee, at the time the contract was executed, the extent of

damages which might arise from the breach of the loan agreement.

*Heller,* 459 F.2d at 899–900.

 The deference to the parties' contractual choices reflected in *Heller* and *United Merchants,* and the court's refusal to evaluate those choices in hindsight, is appropriate in the context of § 506(b) as well. A yield maintenance premium should be allowed as a reasonable charge under § 506(b) if it represents a reasonable estimation of the lender's damages at the time the agreement was entered into. As the court held in *In re Financial Center Associates of East Meadow L.P.,* 140 B.R. 829, 839 (Bankr.E.D.N.Y.1992), "there may be occasion where although the prepayment charge may pass the *United Merchants* muster, the resulting actual charge may be so large and so unjust to the estate and its creditors, that it may be avoided based on § 506(b) reasonableness standard. We do not think, however, that this is such a case."

*Calculation of the Yield Maintenance Premium*

 Following argument, the debtor raised by letter for the first time an objection to VE's method of calculating the Yield Maintenance Premium. The debtor argues that the years remaining on the Loan should be calculated from the date of plan confirmation, not the date of acceleration, as VE proposes. This would reduce by at least 16 months the number of years included in the formula, and would result in a reduction of the Yield Maintenance Premium by more than $1 million.

A full reading of the yield maintenance provisions of the Note leads to the conclusion that this argument must be rejected. Where prepayment follows acceleration, the yield rate is calculated as of the date of acceleration. It would make no sense to employ the date of acceleration in calculating the yield rate, while using the actual payment date in calculating the years to maturity. Moreover, if, in the case of prepayment in connection with acceleration, years to maturity were calculated based upon actual payment date rather than acceleration date, the borrower would obtain a windfall by using delaying tactics to extend the foreclosure process—which is surely not the result intended by the parties. For these reasons, to give effect to the intent of the parties, the term "prepayment date" as used in the formula for calculating years to maturity must be understood as acceleration date, where prepayment follows acceleration. This reading of the Note is consistent with the opening language of the yield maintenance provision of the Note, which states that "this Note may only be prepaid (whether voluntarily or involuntarily . . . and including any acceleration by the holder hereof)." This language shows that for some purposes, under the Note, acceleration will be deemed prepayment.

 The debtor also argues that the Yield Maintenance Premium should not be calculated on the portion of the loan that was paid, following acceleration, through VE's drawdown of a letter of credit. This argument is based on the provision of the Note that prohibits partial prepayments. This argument must also be rejected. The prohibition of partial prepayments is for the lender's benefit, and is obviously not intended to limit the lender's right to a prepayment penalty if the borrower defaults and the lender draws down on the letter of credit securing the loan. Moreover, it is directly contradicted by the Letter of Credit and Security Agreement, executed by the debtor simultaneously with the Note, which expressly authorizes VE to apply the letter of credit proceeds to the prepayment premium applicable when the letter of credit is drawn

down. Agreements that are executed together as part of a single transaction must be construed in a way that harmonizes them. *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197, 36 N.E.2d 106 (1941) (finding that instruments executed at substantially the same time, related to the same subject matter, were contemporaneous writings and must be read together as one, because they effectuate the same purpose and formed a part of the same transaction); *Manufacturers and Traders Trust Co. v. Erie County Indus. Dev. Agency*, 269 A.D.2d 871, 872, 703 N.Y.S.2d 636 (4th Dep't 2000) (finding that contemporaneous agreements must be read together and reconciled, if possible).

*Is VE Entitled to Default Interest as Provided in the Note Under § 506(b)?*

■ The debtor argues that VE is not entitled to both default interest and a yield maintenance premium under § 506(b), because these are duplicative charges. This is not correct. A yield maintenance premium, such as the provision at issue in this case, is structured to provide the lender the present value of the interest which is lost as a result of prepayment. Default interest, on the other hand, is "a means to compensate a lender for the administrative expenses and inconvenience in monitoring untimely payments." *In re Vest Associates*, 217 B.R. 696, 701 (Bankr. S.D.N.Y.1998).

■ The allowability of default interest under § 506(b) was extensively analyzed in *Vest* and in *In re Liberty Warehouse Assoc. Ltd. P'ship*, 220 B.R. 546 (Bankr.S.D.N.Y.1998). As the *Vest* court noted, "[t]he developing consensus is a presumption in favor of the contract default rate subject to equitable considerations." *Vest*, 217 B.R. at 702. These considerations are whether the default rate is "inordinately high" in absolute

terms or in relation to the non-default rate, *id.* at 702, and whether the debtor is solvent. "If a debtor is solvent, there is much more leeway to grant the default rate because other creditors will not be injured." *Id.* at 703.

■ Here, the debtor is being treated as solvent under the Plan, and all creditors, secured and unsecured, will be paid in full, with interest. Both the default interest rate of 12.56%, and the differential of 5% between the default and non-default rates, are well within the range of default rates that have been allowed as reasonable charges under § 506(b). Thus, each of the factors weighed by the courts in *Vest* and *Liberty Warehouse* supports the allowance of the default interest provided under the Note as part of VE's claim under § 506(b). The debtor's objection under § 506(b) to the default interest component of VE's claim is therefore overruled.

### Conclusion

For all of the foregoing reasons, VE's claim under the Plan includes the Yield Maintenance Premium and default interest, each calculated in accordance with the Note. The debtor's objections to VE's claim are therefore overruled.

IT IS SO ORDERED.